Robert B. BROWN, Plaintiff-Appellee,

v.

TEXAS A & M UNIVERSITY, et al., Defendants-Appellants.

No. 85–2710.

United States Court of Appeals, Fifth Circuit.

Nov. 17, 1986.

James C. Todd, Asst. Atty. Gen., Jim Mattox, Atty. Gen., Austin, Tex., for defendants-appellants.

Robert M. Wood, Kingwood, Tex., for plaintiff-appellee.

Before CLARK, Chief Judge, GOLD-BERG and GARWOOD, Circuit Judges.

GOLDBERG, Circuit Judge:

Plaintiff-Appellee Robert B. Brown is a former employee of Defendant-Appellant Texas A & M University (University). Following his separation, Brown filed claims in federal district court under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, and the Civil Rights Act of 1871, 42 U.S.C. § 1983, against both the University and one of his superiors, James R. Reynolds. Brown alleges, *inter alia,* that during the course of his separation, Reynolds and the University failed to adhere to the dictates of the Due Process Clause of the Fourteenth Amendment. The district court denied a summary judgment motion filed by Reynolds and the University, holding that Brown's amended complaint was pleaded with sufficient particularity under the standards set out in *Elliott v. Perez,* 751 F.2d 1472 (5th Cir.1985), and that Brown's allegations had overcome Reynolds' right to qualified immunity. Reynolds appeals.

As more fully set forth below, we reverse the district court's finding that Brown has pled his complaint with sufficient particularity to state a claim under *Elliott.* We hold that Brown's § 1983 claim alleges facts that are insufficient to present a cognizable violation of Procedural Due Process. We thus hold that Brown failed to plead his complaint with sufficient particularity to state a claim under *Elliott.* We also find that the University accorded Brown all the process that he was due. Alternatively, if the actions of which Brown complains were the result of random, unauthorized conduct by an individual official, Brown was afforded constitutionally adequate postdeprivation remedies. Thus, allowing Brown to replead his *Procedural* Due Process claim would serve no useful purpose. We, therefore, remand for an order dismissing this aspect of his complaint.

We further find, however, that Brown may be able to replead his complaint to allege a *Substantive* Due Process claim for retaliation in violation of his rights under the First and Fourteenth Amendments. Although insufficiently elucidated by Brown in either his complaint or his brief before this court, the record before us reveals facts that may be sufficient to support an adequate pleading under *Elliott.* We therefore remand to the district court, so that Brown may have an opportunity to replead his complaint with regard to this one aspect.

## I. Factual Background

From June 1980 until his separation in September of 1983, Brown was an accountant at the Memorial Student Center (MSC) of the University. At the time of Brown's separation Reynolds was, and continues to be, the Director of the MSC. Brown was hired by Reynolds to establish an accounting system at the MSC.

Judged by Brown's payraises and performance evaluations, Reynolds and Brown's immediate supervisor, James Randolph, were delighted with Brown's initial performance; Brown received one of the highest payraises of the MSC employees both in 1981 and in 1982. But the tide of events quickly turned. Beneath the calm surface of Reynolds' and Randolph's apparent satisfaction with Brown's performance, a contentious undercurrent developed.

In September of 1982, Brown found what he thought to be a possible impropriety in the way a faculty member was handling funds. Specifically, Brown discovered that the faculty adviser for the Student Flying Club was leasing airplanes to the club and signing the checks made payable to himself to cover the monthly lease payments, which the adviser received.

Concerned with the potential for abuse, Brown blew the whistle. On several occasions, he informed both Randolph and Reynolds of the possible self-dealing by a faculty member. From that point forward, the tenor of Brown's employment relationship allegedly took on a different pitch. Randolph immediately became "unfriendly, caustic, super-critical, [and] aloof."

Rec.Ex. at 173. It is undisputed that Brown originally received his work assignments orally and informally. But subsequent to his whistleblowing, he received numerous "condescending" written memoranda from Randolph, outlining the tasks that Brown was to perform and setting deadlines for their completion.

In May 1983, Brown received only the minimum, legislatively mandated payraise. On June 10, 1983, Reynolds held a meeting with Brown, at which Reynolds expressed considerable dissatisfaction with Brown's performance. On June 21, Reynolds wrote a rather lengthy memorandum to Brown, detailing the criticisms that he had levelled against Brown at the June 10 meeting. These charges were mainly attitudinal in nature.

Brown subsequently requested another meeting, which was held on June 28. Brown, Reynolds, Randolph and three of Brown's coworkers were present, and Brown read from a prepared statement:

> [I] [p]ut this all together—with considerable thought and no small amount of anguish—[the] latter part of last week. [I] [r]ethought it over the weekend—and changed my mind yesterday—I am going to leave.... I plan to stay with the University somewhere in a higher level position, an equivalent position or a lower level position, but somewhere I can fit in, make a contribution, and not bother people.

Rec.Ex. at 28. On June 30, Brown submitted the following written statement to Reynolds:

> I do believe I have a contribution to make to Texas A & M University. Barring unforseen happenings I have ten years before I reach retirement age. I have a wealth of work experience in a number of areas. I would like to continue with the University in some capacity and I solicit your help in that direction.

Rec.Ex. at 29.

Reynolds and the University contend that Brown's statements of June 28 and June 30 constitute a "voluntary resignation" by Brown. Following the June 30

memo, Brown had a number of meetings with Reynolds and Randolph, at which they discussed when Brown would leave the MSC. Once again "Brown ... expressed his desire to find employment elsewhere at Texas A & M." Brief for Reynolds at 8. It is not clear to what extent Reynolds agreed to assist Brown in his effort to seek another position within the University. The record is also unclear as to whether Reynolds played any part in Brown's inability to secure another job at the University. In any event, Brown wrote another memorandum to Reynolds on July 20, 1983, in which he stated that he was resigning "under protest and without prejudice to any rights I may have to seek relief or damages for violations of my civil rights." Rec.Ex. at 35.

Reynolds responded to Brown's memorandum on July 21 stating:

> I do not understand your letter of July 20, 1983 announcing your resignation "under protest" and your allegations of discrimination....
>
> ....
>
> I will accept this resignation. However, the innuendos included in your July 20 memorandum leave me no alternative but to clearly indicate herein that *you would have been terminated had you not elected to resign.* The termination would have been premised on your inability to maintain a satisfactory relationship with your supervisor ...

Rec.Ex. at 36 (emphasis added). Brown left the MSC and the University on September 1, 1983.

Following his departure, Brown invoked the University's formal grievance procedure. Sometime later in September, Brown had a meeting with a University Vice-President. Unable to obtain satisfaction, Brown next sought relief under the University arbitration procedure. A mutually agreed-upon, neutral arbitrator heard Brown's grievance on December 12, 1983, and issued an award on February 7, 1984. The arbiter determined that "Mr. Brown was

not terminated; he voluntarily resigned." Rec.Ex. at 102.

On July 13, 1984, Brown filed this action against Reynolds and the University in federal district court, asserting actions under the ADEA and § 1983. On September 21, Brown moved for partial summary judgment on his § 1983 claim, asserting that his Due Process rights had been violated by the University's failure to abide by its formal termination procedures. Reynolds and the University cross-filed, asserting the affirmative defenses of qualified and sovereign immunity. The district court dismissed Brown's motion for summary judgment, denied Reynolds' claim of qualified immunity, and dismissed the University as a defendant on the basis of sovereign immunity. Discovery ensued, and Brown and Reynolds were subsequently deposed. Reynolds again moved for summary judgment, reasserting that he was immune from suit under the doctrine of qualified immunity. The district court, however, entered an order reinstating the University as a defendant in the ADEA claim and ordering Brown to replead his complaint in order to conform to the pleading standards established in *Elliott v. Perez.*

Following Brown's amended complaint, Reynolds again filed a summary judgment motion, suggesting that Brown's pleadings continued to be deficient under *Elliott,* and that Reynolds had violated no clearly established constitutional law when Brown's employment relationship was severed such as to present a § 1983 claim against Reynolds. The district court denied Reynolds' motion, and he takes this appeal.

II. Jurisdiction

█ Brown asserts, without elaboration or authority, that "[t]his interlocutory appeal does not deal with a 'final order' in any true sense." Appellee's Brief at 1. Thus, Brown would apparently argue, we do not have jurisdiction under 28 U.S.C. § 1291. This case, however, is within the "collateral order doctrine," because it presents the appeal of a denial of a summa-

ry judgment motion holding that Reynolds does not have qualified immunity.

There exists a "small class [of cases] which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949). Relying on *Cohen* and its progeny, the Supreme Court held in *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), that "a district court's denial of a claim of qualified immunity ... is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Id.* at 2817; *see Jacquez v. Procunier,* 801 F.2d 789, 791 (5th Cir.1986); *Helton v. Clements,* 787 F.2d 1016, 1017 (5th Cir.1986).

The essence of the Court's holding in *Mitchell* is that qualified immunity represents an entitlement not to stand trial at all. Thus, if an erroneous and adverse summary judgment motion were unreviewable at this juncture, the deprivation of the right would in effect never be subject to review, since by hypothesis a trial would occur before review could be had.

> The entitlement is an *immunity from suit* rather than a mere defense to liability; and ... it is effectively lost if a case is erroneously permitted to go to trial. Accordingly ... the denial of qualified immunity should be ... appealable.... [T]he district court's decision is effectively unreviewable on an appeal from a final judgment.

*Mitchell v. Forsyth,* 105 S.Ct. at 2816.

The Court also found that a district court's denial of a summary judgment motion respecting qualified immunity satisfies the other two elements of the collateral order doctrine: conclusive determination of the issue in dispute, and presentation of a claim " 'separable from, and collateral to rights asserted in the action.' " *Id.* at 2816, (*quoting Cohen v. Beneficial Indus-*

*trial Loan Corp.,* 69 S.Ct. at 1225); *see also Coopers & Lybrand v. Livesay,* 437 U.S. 463, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978).

Here, Reynolds appeals from the denial of a summary judgment motion, in which the district court found that he was not entitled to qualified immunity. At first blush, this case appears to be controlled by *Mitchell.* But Reynolds, unlike Mitchell, is also named as a defendant in Brown's ADEA claim, which has survived summary judgment. That order, of course, is an unappealable interlocutory order. Thus, Reynolds must stand trial, even were we to rule that he was entitled to qualified immunity. *See Mitchell v. Forsyth,* 105 S.Ct. at 2812 n. 5 (refusing to decide whether a district court's denial of qualified immunity is appealable when the action also involves a claim for injunctive relief); *see also England v. Rockefeller,* 739 F.2d 140 (4th Cir. 1984) (holding unappealable denials of summary judgment motions asserting qualified immunity in suits also seeking injunctive relief); *Bever v. Gilbertson,* 724 F.2d 1083 (4th Cir.) (same), *cert. denied, sub nom. Rockefeller v. Bever,* 469 U.S. 948, 105 S.Ct. 349, 83 L.Ed.2d 285 (1984). *But see Tubbesing v. Arnold,* 742 F.2d 401, 404–05 (8th Cir.1984) (holding appealable such denials); *De Abadia v. Izquierdo Mora,* 792 F.2d 1187, 1188–90 (1st Cir.1986) (same).

This ground of distinction, premised upon the defendant's mere presence in a suit, is not sufficient to deprive us of jurisdiction. It is true that Reynolds must go to trial in a formal sense to defend against the ADEA claim irrespective of whether he is entitled to qualified immunity on the § 1983 claim. But the University contends, and Brown does not dispute, that Reynolds is merely a nominal defendant in the ADEA claim. According to the undisputed contentions of the University, Reynolds faces no monetary or other personal liability in the ADEA action. In contrast, were Reynolds denied qualified immunity, he would be individually liable for any compensatory and punitive damages that might be assessed in the § 1983 action. Additionally, unlike actions in which plaintiffs seek both monetary and injunctive relief to vindicate the same wrong (the situation that the Supreme Court expressly declined to reach in *Mitchell*), the legal issues presented by the ADEA claim and the § 1983 claim are plainly distinct and designed to address separate legal harms.

In sum, while this case may not be on all fours with *Mitchell,* it is plainly within the animating spirit that informed the Court's holding; *viz.* to obviate " 'the general costs of subjecting officials to the risks of trial— distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service.' " *Mitchell v. Forsyth,* 105 S.Ct. at 2815 (*quoting Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982)); *cf. Tubbesing v. Arnold,* 742 F.2d at 404–05; *De Abadia v. Izquierdo Mora,* 792 F.2d at 1189–90. We thus hold in this case that jurisdiction lies pursuant to 28 U.S.C. § 1291 to review the district court's denial of Reynolds' summary judgment motion respecting qualified immunity. We now turn to the substance of that holding.

### III. Qualified Immunity and *Elliott v. Perez*

In order to overcome Reynolds' claim of qualified immunity, Brown must show that Reynolds' conduct "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 102 S.Ct. at 2738; *Mitchell v. Forsyth,* 105 S.Ct. at 2816; *Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 3018, 82 L.Ed.2d 139 (1984); *Jaquez v. Procunier,* 801 F.2d at 791; *Baddour, Inc. v. United States,* 802 F.2d 801, 806–07 (5th Cir.1986); *Thorne v. Jones,* 765 F.2d 1270, 1277 (5th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1198, 89 L.Ed.2d 313 (1986). In establishing an objective test of qualified immunity, the Supreme Court attempted to strike an appropriate balance between two important concerns: vindicating constitutional rights that have been violated and minimizing societal costs of suits brought against government officials.

The resolution of immunity questions inherently requires a balance between the evils inevitable in any available alternative. In situations of abuse of office, an action for damages may offer the only realistic avenue for vindication of constitutional guarantees.... It is this recognition that has required the denial of absolute immunity to most public officers. At the same time, however, it cannot be disputed that claims frequently run against the innocent as well as the guilty—at a cost not only to the defendant officials, but to society as a whole. These social costs include the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office. Finally, there is the danger that fear of being sued will "dampen the ardor of all but the most resolute, or most irresponsible [public officials], in the unflinching discharge of their duties."

*Harlow v. Fitzgerald,* 102 S.Ct. at 2736, (*quoting Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir.1949) (Hand, J.), *cert. denied,* 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950)) (citations and footnotes omitted); *see also Jacquez v. Procunier,* 801 F.2d at 791–92.

■ Moreover, the issue of qualified immunity is a threshold question, and "[u]ntil this threshold immunity question is resolved, discovery should not be allowed." *Harlow v. Fitzgerald,* 102 S.Ct. at 2738; *see also Mitchell v. Forsyth,* 105 S.Ct. at 2816 ("Unless plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery."). Thus, we held in *Elliott v. Perez,* 751 F.2d at 1479, that § 1983 actions that raise the issue of qualified immunity necessitate heightened pleading standards. The complaint cannot be cast in "broad, indefinite and conclusory terms." *Id.; see Angel v. City of Fairfield, Texas,* 793 F.2d 737, 739 (5th Cir.1986); *Brinkmann v. Johnston,* 793

F.2d 111, 113 (5th Cir.1986); *Hale v. Harney,* 786 F.2d 688, 690 (5th Cir.1986). Rather, the plaintiff must plead specific facts with sufficient particularity to meet all the elements necessary to lay a foundation for recovery, including those necessary to negative the defense of qualified immunity. *Elliott v. Perez,* 751 F.2d at 1479, 1482.

■ Brown inartfully alleges in his § 1983 claim that the procedures incidental to his separation offended the Due Process Clause of the Fourteenth Amendment. In order to make out a Procedural Due Process claim in the context of a wrongful discharge complaint, a former public employee must allege with particularity: (i) the state or federal law or understanding giving rise to the property interest;[1] (ii) the particular process that plaintiff was entitled to and failed to receive; and (iii) that the official's failure to provide these particular processes violated "clearly established constitutional law" at the time of the alleged infraction. In addition, in order to establish a cognizable claim of constructive discharge, a plaintiff must allege particular facts showing either that the employee found herself "between the Scylla of voluntary resignation and the Charybdis of forced termination," or that "the employer's conduct ... [was] motivated by a desire to avoid subjecting its actions to the scrutiny of a termination-related hearing." *Fowler v. Carrollton Public Library,* 799 F.2d 976, 981 (5th Cir.1986).

■ Under the standards set forth above, Brown's amended complaint is completely deficient. Brown states in conclusory terms that he had a property interest in his job and that he did not receive constitutionally adequate process. The complaint alleges that:

Plaintiff was an employee of an agency of the State of Texas, and was subject to being discharged only for good cause. Plaintiff had a property interest in continued employment with Defendant University, and Defendant Reynolds refused

---

1. *See, e.g., Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 2698–2700, 33 L.Ed.2d 570 (1972).

to give Plaintiff his due process rights upon termination.

Rec.Ex. at 503–04. Brown's bare recitation that he could only be fired for cause is insufficient to establish a property interest. In order to show that he had a constitutionally protected property interest, Brown would have had to allege with specificity the particular state rule, regulation, law or understanding between the parties giving rise to the requirement of just cause prior to termination. In this particular case, the University candidly concedes that Brown had a property interest in his job. But as we explain below, this concession is of little help to Brown.

■ Brown has failed to allege with particularity what processes he was due upon his separation from the University that he did not receive. Normally, we would give Brown an opportunity to replead his case to allege the procedural deprivation with particularity. Even though the district court already has permitted Brown to replead his case, the liberal pleading and amendment standards established by the Federal Rules of Civil Procedure mandate that we remand to allow Brown to have another opportunity to plead a cognizable case, if such a case can be made. Fed.R.Civ.P. 15(a) ("leave [to amend the pleadings] shall be freely given when justice so requires."); *see Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). "[T]he *Conley* standard 'exhorts us to excuse mere artless drafting and to overlook superfluous argument in the interest of locating the substance of the pleader's claim.'" *Jacquez v. Procunier*, 801 F.2d at 789, (*quoting Jamieson by and through Jamieson v. Shaw*, 772 F.2d 1205, 1209 (5th Cir.1985)). Unless we have searched every nook and cranny of the record, like a hungry beggar searching a pantry for the last morsel of food, and have determined that "even the most sympathetic reading of plaintiff's pleadings uncovers no theory and no facts that would subject the present defendants to liability," we must remand to permit plaintiff to amend his claim if he can do so. *Jacquez v. Procunier*, 801 F.2d at 791. Having ferreted through the record in this case, as we explain *infra*, we have determined that the Procedural Due Process "allegations of plaintiff's complaint constitute the plaintiff's best case." Even with every possible fact and inference resolved in favor of the plaintiff, we are convinced that Brown cannot state a cognizable claim. We therefore would be remiss if we did not order the district court to dismiss this claim. *Morrison v. City of Baton Rouge*, 761 F.2d 242, 246 (5th Cir.1985) (per curiam). As Judge Reavley explained in *Jacquez v. Procunier*, 801 F.2d at 792.

At the same time, if the protections afforded public officials are not to ring hollow, plaintiffs cannot be allowed to continue to amend or supplement their pleadings until they stumble upon a formula that carries them over the threshold. Such a protracted process is likely to disrupt public officials from their duties as much as discovery itself. At some point a court must decide that a plaintiff has had fair opportunity to make his case; if after that time, a cause of action has not been established, the court should finally dismiss the suit.

In sum, it would be a waste of judicial resources, the resources of the parties, and merely an effort in futility to allow Brown to amend his complaint further in this regard.

IV. Procedural Due Process

Brown advances three theories in support of his Procedural Due Process claim. First, Brown posits that the University's admitted failure to comport with its internal pretermination procedures amounts to a *per se* Due Process violation. Second, Brown asserts that the predeprivation process accorded to him was insufficient to comport with constitutional norms. Finally, Brown argues that Reynolds' act of either accepting Brown's resignation or, in the alternative, terminating Brown was an unauthorized, *"ultra vires"* act, repugnant to the Constitution.

The University freely admits that they did not accord Brown the pretermination procedures set forth in its policy manual.

Rather, the University contends that, since Brown "voluntarily resigned," it was impractical and unnecessary to adhere to its normal pretermination procedures. Brown counters that he did not voluntarily resign, but that he was forced to resign; *i.e.,* that he was either constructively or actually discharged. Brown, therefore, asserts that the University was required to conform to its pretermination regulations, and that its failure to do so amounts to a violation of the Due Process Clause. The syllogism is flawed.

■ Assuming *arguendo* that Brown were terminated or that Brown found himself "between the Scylla of voluntary resignation and the Charybdis of forced termination," *Fowler v. Carrollton Public Library,* 799 F.2d at 981, the University's admitted failure to comport with its internal pretermination procedures does not by itself amount to a violation of the Due Process Clause. The failure of a state agency to comply with its internal regulations is insufficient as a matter of law to establish a violation of Due Process, because constitutional minima nevertheless may have been met. *Franceski v. Plaquemines Parish School Board,* 772 F.2d 197, 199, 200 (5th Cir.1985). "There is not a violation of due process every time a university ... violates its own rules. Such action may constitute a breach of contract or violation of state law, but unless the conduct trespasses on federal constitutional safeguards, there is no constitutional deprivation." *Levitt v. University of Texas at El Paso,* 759 F.2d 1224, 1230 (5th Cir.), *cert. denied sub nom. Levitt v. Monroe,* —— U.S. ——, 106 S.Ct. 599, 88 L.Ed.2d 578 (1985); *see Davis v. Scherer,* 486 U.S. 183, 104 S.Ct. 3012, 3019–20 & n. 11, 82 L.Ed.2d 139 (1984).

■ The crucial inquiry is thus whether Brown was entitled to some process that he did not receive as a matter of "clearly established constitutional law" at the time he was arguably discharged by the University on September 1, 1983. It was well-settled by 1983 that "[o]nce it is determined that a public employee has a protected interest in continued employment, the Constitution requires that he be given notice and an opportunity to be heard prior to his termination." *Jones v. Orleans Parish School Board,* 679 F.2d 32, 36 (5th Cir.) (citation omitted), *modified on other grounds,* 688 F.2d 342 (1982), *cert. denied,* and *appeal dismissed,* 461 U.S. 951, 103 S.Ct. 2420, 77 L.Ed.2d 1310 (1983); *Phillips v. Vandygriff,* 711 F.2d 1217, 1223 & n. 5 (5th Cir.1983). Because Brown was afforded both constitutionally adequate notice and hearings, his procedural claim is utterly unavailing.

In a meeting with Reynolds on June 10, Brown was appraised of the University's dissatisfaction with his job performance. On June 20, Reynolds sent Brown a 4½ page, single-spaced memorandum, clearly and painstakingly detailing his alleged inadequacies. Brown unquestionably received adequate notice.

Brown had many further meetings with Reynolds, or with Randolph, between June 20 and September 1. Most of the meetings focused on establishing the precise date on which Brown would leave the MSC. Had he chosen to do so, Brown could have, and in some cases may have, contested both the University's charges and its contemplated action on myriad occasions. Although informal in nature, these meetings presented Brown with more than adequate opportunity to have his case heard, and thus were sufficient to satisfy constitutional minima. As the Supreme Court recently explained in *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985):

> [T]he pretermination "hearing," though necessary, need not be elaborate.... In general, "something less" than a full evidentiary hearing is sufficient prior to adverse administrative action....

> . . . .

> The essential requirements of due process ... are notice and an opportunity to respond. The opportunities to present reasons, either in person or in writing,

why proposed action should not be taken is a fundamental due process requirement.... The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story.... *Id.* at 1495, (*quoting Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 907, 47 L.Ed.2d 18 (1976)).

The Court's holding in *Loudermill* was predicated on the fact that the public employee received a full posttermination proceeding "at a meaningful time." *Id.* at 1496, (*quoting Armstrong v. Manzo,* 380 U.S. 545, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). Brown separated from the University on September 1, and obtained a full evidentiary hearing before a mutually-selected, impartial arbitrator on December 24. Not only is this short period between Brown's departure and the full postdeprivation hearing fully consonant with the Due Process Clause, but in addition Brown could have invoked the University's formal grievance and arbitration procedure prior to the alleged deprivation. In short, even if his case were properly pleaded, Brown's allegations could not establish that he was deprived of constitutionally adequate procedures.

■ Finally, Brown argues that Reynolds' act of terminating him or, alternatively, of accepting his resignation was "*ultra vires,*" beyond Reynolds' authority as established in the University's regulations. Assuming the accuracy of Brown's factual premise, it does not serve to remedy his ailing Procedural Due Process argument. On the contrary, it is fatal. It is now axiomatic that the Due Process Clause is not triggered when the action complained of results from random, unauthorized conduct by a state official, if there are adequate state-provided remedies available. *See, e.g., Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 1917, 68 L.Ed.2d 420 (1981); *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 3204, 82 L.Ed.2d 393 (1984); *Holloway v. Walker,* 784 F.2d 1287, 1291, 1293 (5th Cir.1986).

Brown secured a prompt postdeprivation arbitration. The arbitrator could have ordered Brown's reinstatement. Brown, moreover, could have sought judicial review of the arbitral award if he thought that the decision was not supported by substantial evidence. *See, e.g., Viverette v. Luraleen B. Wallace State Junior College,* 587 F.2d 191, 194 (5th Cir.1979). Thus, Brown's "*ultra vires*" theory, even were there a predeprivation constitutional infirmity, would refute, rather than establish, a credible Procedural Due Process claim. Because the record fails to indicate any facts upon which a Procedural Due Process claim might be established, we must reverse the district court's finding to the contrary.

## V. Substantive Due Process: Whistleblowing and the First Amendment

■ Because Brown complains of a Due Process deprivation in general terms, our inquiry cannot be confined to whether he has a legally sufficient procedural claim. Whether the acts complained of were random and unauthorized, or whether there were adequate predeprivation or postdeprivation state remedies are irrelevant considerations in determining the legal sufficiency of a Substantive Due Process claim under *Elliott. See, e.g., Augustine v. Doe,* 740 F.2d 322, 325–27 (5th Cir.1984); *Holloway v. Walker,* 784 F.2d at 1293. Brown's complaint in this regard is not pled with sufficient legal or factual particularity to surmount the hurdle established in *Elliott.* But in contrast to his procedural claim, the record contains strong intimations that Brown may be able to plead a cognizable § 1983 claim alleging a violation of Substantive Due Process under the First and Fourteenth Amendments. Brown may assert he was terminated or, in the alternative, constructively discharged for engaging in protected expression. *See Jett v. Dallas Independent School District,* 798 F.2d 748, 757–759 (5th Cir.1986). We thus remand to the district court in order to permit Brown to amend his complaint to

plead sufficient facts to state a claim under the First and Fourteenth Amendments.

■ The record indicates that Brown might claim Reynolds and the University retaliated against Brown for whistleblowing. Brown uncovered what he thought might have been a financial impropriety by a faculty member. He says, as a diligent public servant, he repeatedly reported the alleged corruption, or potential for corruption, to his superiors, both orally and in writing. Shortly thereafter, Brown's relationship with his immediate supervisor allegedly took on a discordant note; his superiors allegedly began to "build a case" against him. These events culminated in Brown leaving the MSC and the University.

Brown's particular expression of misgivings about public institutional expenditures could constitute whistleblowing by a public employee, which is "speech" protected by the First Amendment. If whistleblowing were not within the protective bosom of the First Amendment, our government would be shorn of many of the instruments of investigation, which effectively have led to the elimination of a few bad apples among the barrels of very efficient, effective, honorable and honest public servants. Public employees are uniquely qualified to reveal unseemly machinations by their fellow employees because they observe them on a daily basis. A paramount priority of the First Amendment is to protect expression relating to "the manner in which government is operated or should be operated." *Mills v. Alabama*, 384 U.S. 214, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484 (1966). The need for First Amendment protection of expression which seeks to expose, and hopefully to alleviate, scurrilous governmental conduct has gained renewed emphasis by the tragic events of Watergate. The fact that the speech was delivered privately to Brown's superiors, rather than to Bob Woodward and Carl Bernstein,[2] does not necessarily render the speech any less pro-

tected. *Givihan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979); *Gonzales v. Benavides*, 712 F.2d 142, 146 (5th Cir. 1983). A public employee who engages in whistleblowing does not "forfeit[ ] his protection against governmental abridgment of freedom of speech if he decides to express his views privately rather than publicly." *Givihan v. Western Line Consolidated School District*, 99 S.Ct. at 696; see *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 1689, 1691 & n. 8, 1693, 75 L.Ed.2d 708 (1983).

It cannot be gainsaid that in our society, pervaded with the ubiquitous and sickening spectre of governmental irregularity and mendacity, an expression relating to possible financial improprieties by a fellow public servant is a "matter of public concern." See *Connick v. Meyers*, 103 S.Ct. at 1690 (public employee "speech" must relate to a "matter of public concern" to come within the ambit of the First Amendment). Thus, based on the record currently before us, Brown may not be addressing a matter "only of personal interest." *Id.* at 1689–90. Unlike Myers, Brown may properly be able to allege that he was attempting "to bring to light actual or potential wrongdoing or breach of public trust." *Id.* at 1691. Therefore, as determined from the "content, form, and context" of his statements, though delivered in private conversation and memoranda, Brown's expression may have related to a matter of vital public concern. *Id.* at 1690 & n. 7. Finally, there is no evidence in the record that Brown's whistleblowing might have been directed against one with whom he worked on a daily basis such that his speech could have resulted in contention among co-workers or difficulty in maintaining discipline. *Pickering v. Board of Education of Township High School District* 205, 391 U.S. 563, 88 S.Ct. 1731, 1735, 20 L.Ed.2d 811 (1968); *Gonzalez v. Benavides*, 712 F.2d at 146.[3]

**2.** *See* B. Woodward and C. Bernstein, *All the President's Men* (1974).

**3.** At this juncture, since we are only remanding to afford Brown an opportunity to amend his

complaint, we need not determine the applicability *vel non* of *Terrell v. University of Texas System Police*, 792 F.2d 1360 (5th Cir.1986), to his case. We also need not decide how *Terrell*

All of these First Amendment principles were well-established by 1983. Therefore, if Brown can amend his complaint to plead with particularity the facts showing that his expression was a "substantial" or "motivating factor" in his departure from the MSC and the University, he will have met the test of *Elliott.* *See e.g., Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).

Justice requires that Brown be given one more opportunity to amend his pleadings to conform to the standards of *Elliott.* Fed. R.Civ.P 15(a); *Jamieson by and through Jamieson v. Shaw,* 772 F.2d at 1208–09, 1211. We neither express nor intimate any view as to whether, if Brown should amend his pleadings, he can prove the resultant claims made. The case is thus RE-VERSED and REMANDED to the district court for further proceedings consistent with this opinion.

---

relates to the cases we cite in the text of this opinion. We note, however, that for a public employee's whistleblowing to be an expression protected by the First Amendment, the public employee must "speak[ ] out as a citizen on a matter of general concern, *not tied to a personal employment dispute.*" *Id.* at 1363 (*quoting Connick v. Myers,* 103 S.Ct. at 1691 n. 8) (emphasis in original).