H.B. MAXEY, Jr. (a.k.a. "Bud" Maxey), Plaintiff,

v.

Robert A. SMITH, Individually and as Alderman/Vice Mayor, City of Starkville, Emmett Smitherman, Jr., Individually and as Alderman, City of Starkville, Ed Buckner, Individually and as Alderman, City of Starkville, Harold E. Williams, Individually and as Alderman, City of Starkville, Melvin Rhodes, Individually and as Alderman, City of Starkville and Ben Hilbun, Jr., Individually and as City Attorney for the City of Starkville, and the City of Starkville (already a party via suit against the above named defendants in their official capacity, but nevertheless separately named), Defendants.

Civ. A. No. 1:93CV122–D–D.

United States District Court, N.D. Mississippi, E.D.

June 11, 1993.

---

James M. Ward, Ward & Williamson, Starkville, MS, for plaintiff.

J. Gordon Flowers, Gholson, Hicks, Nichols & Ward, Columbus, MS, for defendants.

## MEMORANDUM OPINION

DAVIDSON, District Judge.

### I. Preliminary Injunction

Over the course of two days spaced two weeks apart, the undersigned District Judge conducted a hearing on Plaintiff's application for preliminary injunctive relief. Specifically, the applicant's request is spurred primarily by a desire to vindicate his right to freedom of speech and expression under the First Amendment of the United States Constitution. Precisely one day after comments attributable to him appeared in the local print media, Plaintiff was systematically relieved of his duties as police chief and placed on administrative leave. He implores this court to order his reinstatement. In considering whether an exercise of this court's equitable powers should issue, the Undersigned consults the well-established quantitative test for awarding injunctive relief found in *Canal Authority of the State of Florida v. Callaway*, 489 F.2d 567 (5th Cir.1974). Applying the four requisite *Canal* factors to the case at bar, the court concludes that the request for injunctive relief is well taken. Equity permits nothing less than an order fully reinstating Plaintiff to his position as Chief of Police of the City of Starkville.

### II. Factual Summary

Plaintiff became the sixth chief of police hired by defendant municipality City of Starkville in a time span of just ten years. Having served on the police force of Tampa, Florida, Plaintiff assumed the Starkville ap-

pointment with an impressive law enforcement background covering thirty-two years. His credentials include a bachelor of arts degree in criminal justice from the University of South Florida and an associate degree from St. Petersburg Community College. He is also a 1981 graduate of the FBI National Academy. Appointed in 1989, Plaintiff has been credited with significantly modernizing the Starkville police department which, according to the testimony of its current Captain, David Lindley, lagged as many as "ten years behind everyone else" in law enforcement operations and practices. The favor Plaintiff enjoys among members of the police force he heads and the region's law enforcement community in general, however, contrasts sharply with the adversity which he has encountered with the Starkville city attorney and certain members of the board of alderman.

Formal board action against Plaintiff has ranged from issuance of a reprimand to a more severe level: placement on administrative leave.

### a. The Newspaper Comments of April 13, 1993

The decision to put Plaintiff on administrative leave was prompted by critical comments he made to a reporter preparing a news article for the *Commercial Dispatch,* a daily newspaper published in Columbus, Mississippi. Plaintiff's statements appeared in the *Commercial Dispatch* April 13, 1993 issue in a front page story concerning the completion of an independent investigation of a Starkville murder/rape case occurring in 1990. In an unprecedented move, the board of alderman had hired a special investigator, George Beckett, to reinvestigate the case, known in media and other accounts as the "Jones–Criggler" murder and rape. (To this date, the crime remains unsolved.) At the completion of Beckett's investigation, which was reported as beginning on February 3, 1993, Defendant City on April 12, 1993, issued a press release announcing that a "logical suspect has been identified." The *Dispatch,* after contacting Plaintiff for his comments, quoted him in its article as saying, "I haven't

seen the actual investigative report, but as far as I could determine, nothing was reported ... that we didn't already know[;] [t]here was no new evidence." Continuing, the article reported that Plaintiff could not offer further "comment on the [independent] investigation, because[,]" he explained, "I wasn't a part of it." Elaborating, Plaintiff remarked, "I have been denied being [a] part of the investigation and denied access to the investigative report." When the interviewing reporter apparently asked why Plaintiff had not been given access, he responded, "I think I was denied access to the report because it is totally inaccurate and they know I can point out inconsistencies."

Incensed by Plaintiff's comments to the newspaper, Defendant, Robert A. Smith, proceeded to orchestrate a series of maneuvers that culminated in Plaintiff's involuntary administrative leave status. Smith, who, at the time of these proceedings, held the dual office of alderman and vice-mayor, testified at trial, "[W]hen the article hit [the newsstands], I had had enough! I [was] through! I [was] done! I wanted to put him on administrative leave!"

### b. The "Action Apparel" Midday Meeting on April 14, 1993

Defendant, Alderman Smith, related at the hearing that after reading the "newspaper article" in the April 13th *Commercial Dispatch,* "that was the final blow." He "was ready to put the guy [Chief Maxey] on administrative leave...." So, he assembled an informal noon time meeting with just two other aldermen—Defendants, Emmett Smitherman and Melvin Rhodes; also in attendance were the mayor's administrative assistant David Brisolara, and Defendant, City Attorney Ben Hilbun, Jr., who, at Smith's behest, later telephoned defendant, Harold Williams. Although the group numbered a total of five, only three aldermen were in actual attendance; the meeting was deliberately limited to three, a figure less than the number needed for a quorum, so as to avoid committing a violation of the open meetings [1] policy. As Defendant, Smith, testified at

---

**1.** Open Meetings Law of Mississippi, MISS. CODE ANN. § 25–41–1 et seq. (1991).

hearing, "[F]our aldermen is [sic] a quorum, so you can't meet [informally] with four aldermen; you can meet with three aldermen; you can meet with two aldermen, or you can have a phone conversation."

In the presence of those gathered, Smith expressed his desire to "put [Plaintiff] on administrative leave with pay, using accumulated sick leave and vacation time." Alderman Smitherman echoed those sentiments. A canvassing of those privy to the initial discussions indicated a general willingness among them to place Plaintiff on administrative leave. For all intents and purposes, a decision had been made: Police Chief Maxey would be placed on administrative leave. A second matter, naming Larry Sisk acting police chief, was also discussed. The formal motions implementing these decisions would be drafted and brought by Defendant, City Attorney, later that evening when the full board convened for a special meeting called by Defendant, Smith, after reading the newspaper article carrying Plaintiff's comments.

### c. The April 14, 1993 Afternoon Consultation

After disbanding, the same group conferred again in the afternoon to discuss two other proposals resulting in two additional motions. Defendant, Harold Williams, wanted John Outlaw named as assistant chief. A fourth and final motion would call for the escorting of Plaintiff from police department premises by Larry Sisk.

### d. The April 14, 1993 6:00 pm Special Board Meeting

The four pre-arranged and decided motions were systematically brought that evening. It was apparent to the two members who cast the only dissenting votes, Alderwoman Mary Lee Beal and Alderman Wendell W. Gibson, that the evening's proceedings were, literally and figuratively, just a matter of "going through the motions."

A member of the aldermanic board for sixteen years, Alderwoman Beal testified in court, "It was all set to go. A press release announcing Chief Maxey's removal was all typed out in advance." Testimony consistent with Ms. Beal's account was elicited from Alderman Gibson. He explained that the "usual time frame" of a board meeting runs "anywhere [between one and] five hours." He estimated that the evening meeting on April 14, 1993, lasted no more than ten minutes. In his words, the content of the meeting obviously "had been preplanned...." The trumped-up proceeding was over before it began. "After ... opening prayer and the Pledge of Allegiance," a sequence of four motions were adopted with little or no discussion. Every motion concerned steps to be taken in relation to Plaintiff's placement on administrative leave. Gibson testified, "I had never seen anything like that happen." Referring to city policy and custom of adhering to basic principles of procedural due process, Gibson continued, no notice had been given to Chief Maxey. "It made me so mad, I couldn't see straight, and there was nothing I could do."

### e. The Resolve of Prior Problems and Disagreements Between Defendant Board Members and Police Chief Maxey

Aside from comments Plaintiff made to the press, there were a few prior actions he allegedly took that did not meet with the Board's approval, namely: 1) arranging training for Russell Gaines, a civilian, through the Tupelo Police Training Academy without obtaining prior board approval; for this, Plaintiff received an official reprimand; (2) purchasing four motor vehicles without soliciting bids; (3) voiding a ticket; and (4) allegedly claiming he "salvaged" the D.A.R.E. program from being slashed by the budget committee. All of these incidents, however, transpired prior to the so-called, "bury-the-hatchet" meeting conducted near the end of 1992. As the time frame and characterization of the meeting expressly imply, any residual animosities or differences concerning the above enumerated perceived offenses already had been "buried" when defendants relieved Plaintiff of his official duties on April 14, 1993, exactly one day after he was quoted in the *Commercial Dispatch*.

### 1. Tupelo Police Academy Training Arrangements for Russell Gaines

Russell Gaines trained and handled the police dog which Starkville used for detecting narcotics. Plaintiff was interested in placing Gaines on the yet-to-be-organized reserve police force. To serve on the reserves, Gaines was expected to undergo nine weeks of training and certification. Plaintiff secured a training slot for Gaines at the Tupelo Police Academy at no cost. Gaines was allowed to attend the Academy for free in a gesture of reciprocation. Earlier, petitioner had accommodated a request from Tupelo for two free openings in the Glock pistol[2] training classes conducted at the Regional Training Center in Starkville. This practice was not unusual. In fact, similar exchanges had been customary for approximately ten years. Gaines, however, technically was not a Starkville law enforcement employee, although Plaintiff listed him as such with a zero sum salary and an August 24, 1992, date of hire on the "Standards and Training" application for certification he submitted to Tupelo. (Exh. P–2.) According to Plaintiff's attorney, listing a salary base of zero signified Gaines' non-employee status. Because Plaintiff did not seek prior board approval to take this action, he received an official reprimand for "deviat[ing] from City policy by incorrectly stating on an official document that a non-city employee was an employee without prior Board approval and for violation of the Minor Decree[3] by providing an opportunity to personnel on a non-competitive basis." (Exh. D–1.) (Repeated statements throughout the hearings that Plaintiff furnished Gaines with a Starkville police uniform and badge are not contained in any part of the official reprimand placed in Plaintiff's personnel file. (Exh. P–3.)

█ The issuance of the reprimand led Plaintiff to file on December 22, 1992, a formal employee grievance consistent with City procedure. It is the policy of the City of Starkville to afford an "aggrieved employee the right to a due process hearing prior to the taking of any disciplinary action which would in any way deprive an employee of an interest in property." (Exh. P–17 and "Employee Grievance Procedure" form, attached as Exh. "6" to "Defs.' Opp. Mem. Brf.") Defense counsel, Dewitt T. Hicks, Jr., who, incidentally, is also counsel for Defendant Municipality's liability insurance carrier and city attorney for the City of Columbus, Mississippi, was appointed by the board to act as the independent hearing officer for Plaintiff's formal grievance hearing. The selection of Hicks, from Plaintiff's standpoint, tainted the grievance process. Because of Hick's close association and friendship with Defendant, City Attorney Hilbun, Plaintiff understandably wondered what was his likelihood of obtaining a fair and impartial hearing. The assurances received from Columbus Chief of Police Pete Bowen that Hicks would act impartially fell short of fully alleviating legitimate concerns Plaintiff had over potential bias. Without passing on the prudence of assuming dual roles that force an issue of divided loyalties, the court is mindful that even the "appearance of impropriety," however slight, merits some consideration. *Cf. United States ex rel. S.E.C. v. Carter*, 907 F.2d 484, 488 (5th Cir.1990) (appointment of SEC attorneys as special prosecutors was erroneous; attorneys' previous involvement in underlying civil case created potential for conflict and appearance of impropriety).

A grievance hearing was scheduled and held on February 1, 1993, to determine whether the reprimand properly issued. Objecting to a closed forum, Plaintiff exercised his prerogative not to attend. Paragraph (a)(4) of the City Personnel Policy Manual expressly states, "[T]he employee, if he or she desires, may attend the meeting." (Exh. P–17.)

### 2. The Purchase of Four Police Vehicles

According to Ken Winfield, the auditor for the City of Starkville, the $39,000 purchase of four Ford police vehicles for the multi-jurisdictional drug task force was not in strict

---

**2.** The Glock pistol is an Austrian-made semiautomatic weapon.

**3.** The Minor Decree refers to the pronouncement in *Minor v. City of Starkville,* and calls "for the employment of police[ ] [officers] to be advertised." Exh. P–3.)

compliance with procedures for equipment procurement. The decision to purchase the vehicles had the approval of the City's purchasing agent, and was acted on with the knowledge of Defendant, City Attorney Hilbun. It is not the police chief's responsibility to advise the board of aldermen on legal matters.

### 3. *Voiding a Traffic Citation*

Plaintiff voided a ticket at the request of the issuing officer. Defendants contend Plaintiff did not have the requisite authority to take this action, and relented to pressure, considering who was the ticket recipient: Constable Jimmy Sheridan.

### 4. *Claims of "Salvaging" the D.A.R.E. Program*

Defendant, Alderman Smitherman, stated during his hearing testimony that Plaintiff falsely claimed credit in the press for salvaging funding for D.A.R.E., a popular drug prevention program designed to reach school-age children, at the expense of four new vehicles. He alleged that Plaintiff "attacked" a member of the budget committee, defendant, Alderman Buckner, for his "soft" support on funding D.A.R.E.

During a particular board session, Plaintiff had requested funding for additional police vehicles and continued operation of D.A.R.E. Buckner allegedly balked at the request for continued funding of D.A.R.E., asking Plaintiff to justify its costs. Ultimately, spending for D.A.R.E. was approved. The purchase request for more vehicles, however, was disallowed. Defendants resented comments attributed to Plaintiff in the newspaper that he had succeeded in saving the D.A.R.E. program from extinction. Defendant, Alderman Smith, also expressed annoyance over the media accounts that Plaintiff had "salvaged" D.A.R.E., and stated on the witness stand, "[As a result of his] comments to the [*Commercial*] *Dispatch*, [Plaintiff] had public support on his side." By contrast, Smith and, perhaps, other board members, experienced a barrage of telephone calls from teachers and parents inquiring, "Why [were] [they] against D.A.R.E.?"

Prefacing its legal discussion, the court notes it is of the opinion that Defendants' retrieval of the prior occurrences outlined above is an attempt in retrospect to conjure up and present some plausible or seemingly legitimate basis for their April fourteenth actions that will withstand constitutional scrutiny. The task is an arduous one, considering that the overwhelming weight of evidence reveals that the statements attributed to Plaintiff in a front page story appearing in the April 13, 1993 issue of the *Commercial Dispatch* were the "substantial [ ] motivating factor[s]" sequentially triggering the April 14, 1993 employment decision by Defendants to place him on administrative leave. *Boddie v. City of Columbus, Mississippi*, 989 F.2d 745, 751 (5th Cir.1993). Having lain the foundation for its decision, the court discusses its legal analysis.

### III. Conclusions of Law

■ The extraordinary relief of a preliminary injunction is a discretionary matter for the trial court. The criteria for determining whether a request for preliminary injunctive relief should be granted is ensconced in *Canal Authority of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir.1974). The Fifth Circuit case remains the preeminent authority on what elements are necessary before a court is in a position to even consider granting preliminary injunctive relief. *Allison v. Froehlke*, 470 F.2d 1123, 1126 (5th Cir.1972). The four basic requirements are as follows:

> (1) a substantial likelihood that plaintiff will prevail on the merits; (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to plaintiff [if the injunction is denied] outweighs the threatened harm to defendant [if the injunction is granted]; and (4) that granting the preliminary injunction will not disserve the public interest.

*Canal Authority*, 489 F.2d at 572. A preliminary injunction is a powerful remedy used sparingly in cases with a set of extraordinary circumstances.[4] Given their nature, injunctions should only be granted when the movant has fully carried his cumulative burden of

---

4. As a point of illustration, the undersigned Dis-    trict Judge pauses briefly to note that since his

persuasion on each of the four *Canal Authority* prerequisites. At all times, the burden of proving that the prerequisites are met rests with plaintiff. *Id.* at 573. Even if the plaintiff successfully establishes all four *Canal* prongs, the decision of whether to grant or deny a preliminary injunction remains discretionary with the court. *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir.1985). "The decision to grant a preliminary injunction is to be treated as the exception rather than the rule." *Id.* A preliminary injunction is an extraordinary remedy which the court is reluctant to use except in extreme circumstances. *See, e.g., Russell v. Harrison*, 736 F.2d 283, 286 (5th Cir.1984).

■ Guided by the above cited case law, the court has exhaustively considered the original and supplemental briefs, the arguments and exhibits offered by the parties, and the record of evidence as a whole to arrive at its conclusion. Following a careful and lengthy review of the record before it, the court finds that Plaintiff has indeed prevailed on every facet of the *Canal Authority* formula. All of the *Canal* prongs have been established by either a preponderance of the evidence or equities to the court's satisfaction. The request for a preliminary injunction is, therefore, well taken. Defendants are ordered to fully reinstate Plaintiff to his rightful position as the Chief of Police for the City of Starkville.

While all four factors weigh equally in the equation, the demonstration of a substantial threat of suffering irreparable harm is often the most daunting. The involvement of First and Fourteenth Amendment rights, however, adds a unique dimension to the notion of irreparable injury. Thus, the court finds it appropriate to begin with the second prong: irreparable harm.

1. **The Board's Actions on April 14, 1993 Clearly Indicated a Violation of Plaintiff's First Amendment Rights, and, therefore Subjected Him to Irreparable Harm**

■ As a matter of law, federal courts at all levels have recognized repeatedly that constitutional rights violations constitute irreparable harm. *Cohen v. Coahoma County, Mississippi*, 805 F.Supp. 398, 406 (N.D.Miss. 1992) (citing *Elrod v. Burns*, 427 U.S. 347, 373–374, 96 S.Ct. 2673, 2689–2690, 49 L.Ed.2d 547, 565 (1976); *Deerfield Medical Center v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir.1981) (other citations omitted)). "The loss of First Amendment freedoms for even minimal periods of time, unquestionably constitutes irreparable injury." *See Elrod*, 427 U.S. at 373, 96 S.Ct. at 2690, 49 L.Ed.2d at 565 (affirming court of appeals finding that district court abused its discretion by denying preliminary injunction to Republican party affiliated employees discharged by newly elected Democrats); *Southeastern Promotions, Limited v. City of Mobile, Alabama*, 457 F.2d 340, 341 (5th Cir.1972) (municipality's decision refusing use of public auditorium for performance of musical production, "Hair," amounted to restraint on freedom of speech and irreparable harm; remanded from court of appeals to district court with specific orders to grant promoter's request for preliminary injunction); *Deerfield*, 661 F.2d at 338 (Fifth Circuit has held that violation of constitutional rights constitutes irreparable injury). When a public servant speaks out critically against his governmental employer on matters of public concern, his speech is protected from adverse consequences heaped upon him by a vengeful governmental employer. *Watts v. Alfred*, 794 F.Supp. 431, 433 (D.D.C.1992) (citing *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (other citation omitted).

As a public officer, petitioner had a moral obligation and duty to comment on his perceptions that the "Jones–Criggler" reinvestigation was misguided or inaccurate. The public criticisms Plaintiff raised with respect to the independent investigative findings clearly spoke to a matter of public concern.

appointment to the federal judiciary in 1985, this is the first and only instance in which he has

granted a request for a preliminary injunction.

If nothing else, defendants' issuance of a press release announcing the completion of the independent investigation of the yet unsolved murder/rape case plunged the matter into the public domain. Consequently, their accusations and claims during hearing that Plaintiff somehow displayed egregious judgment by speaking publicly through the press about on ongoing investigation carried trifling force.

■ Equally unpersuasive were defense counsels' arguments that the employment-at-will status[5] of the relationship between the parties justified the Board's decision to remove the police chief from his official duties. While an at-will employee is subject to the whims of his employer and, thus, may be terminated by his employer for a good reason, wrong reason, or no reason, *see Kelly v. Mississippi Valley Gas Co.*, 397 So.2d 874, 874–75 (Miss.1981), he may not be terminated for an unconstitutional or illegal reason! *Solomon v. Walgreen Co*, No. 1(EC):91–86–D–D (N.D.Miss.) *aff'd*, 975 F.2d 1086 (5th Cir.1992). *See Boddie*, 989 F.2d at 751 (discharged fireman reinstated, following jury finding that firing resulted from fireman's association with members of fireman's union, in violation of his freedom of association rights guaranteed by First Amendment). *Cf. Laws v. Aetna Finance Co.*, 667 F.Supp. 342, (N.D.Miss.1987) (employee's refusal to commit illegal act requested of him by employer should create a narrow public policy exception to termination at will rule; employee should not be faced with choice between following law or forfeiting employment).

Aside from the irreparable harm arising from the First Amendment infringements, the testimony of several respected veteran law enforcement officers from the surrounding Northeast Mississippi region highlighted the irreparable harm Plaintiff has endured, and in all likelihood, will continue to suffer. Each unequivocally testified that the Chief's reputation and standing in the law enforcement arena has been and continues to be severely damaged by the actions of the Board of Aldermen. The amount of harm he has sustained cannot be quantified in terms of a money judgment. *See Better Business Bureau of Metropolitan Houston, Inc. v. Medical Directors, Inc.*, 681 F.2d 397, 403 (5th Cir.1982) (perception created in ads disseminated by weight loss center that it carried endorsement of Better Business Bureau posed threat of irreparable harm to Bureau's "carefully cultivated" reputation of independence; issuance of preliminary injunction affirmed). The court has no doubt that Plaintiff has satisfied the requirement of demonstrating a substantial threat of irreparable injury.

### 2. A Substantial Likelihood of Prevailing on the Merits

There is a substantial likelihood that Plaintiff stands to ultimately prevail at trial on both of his constitutional claims: free speech under the First Amendment and due process, procedural as well as substantive, via the Fourteenth Amendment.

#### a. *Free Speech Claim*

■ The record is replete with evidence that Plaintiff was placed on administrative leave purely for exercising his First Amendment right to freedom of speech. Plaintiff's at-will status does not diminish his free speech rights under the First Amendment. *Cf. Alaniz v. San Isidro Independent School District*, 742 F.2d 207 (5th Cir.1984) (court of appeals affirmed both jury findings that plaintiff's political activities were a substantial or motivating factor in school district's decision to discharge plaintiff, and court's issuance of injunction requiring school district to reinstate her; discharge violated plaintiff's First Amendment rights); *Williams v. Board of Regents of University System of Georgia*, 629 F.2d 993 (5th Cir. 1980) (preliminary injunction reinstated police officer to his previous position; trial court anticipated appellee would prevail on his First Amendment claim).

#### b. *The Procedural Due Process Violation*

■ Plaintiff alleges in his complaint that Defendants afforded him neither notice, nor

---

**5.** Mississippi has followed the employment- at-will rule since 1858. *See Butler v. Smith &* *Tharp*, 35 Miss. 457, 464 (1858).

an opportunity to be heard, before placing him on administrative leave, expending his vacation and sick leave.

█ The first inquiry in any due process claim is whether the claimant has suffered a deprivation of a protected interest: life, liberty or property. U.S. CONST. amend. XIV, § 1. To have a property or liberty interest protected by the Fourteenth Amendment, the United States Supreme Court explained in *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548, 560 (1972) (cited in *Mahone v. Addicks Utility Dist. of Harris County,* 836 F.2d 921, 929 (5th Cir.1988)):

> [A] person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. The Due Process Clause of the Fourteenth Amendment requires *notice and a hearing* before termination from public employment only if such termination would infringe a liberty or property interest. *Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972).

(emphasis added). The relevant interest in the case at hand is one of property.[6] Since the Fourteenth Amendment prevents states from depriving persons of their property interests without due process of law, the immediate question for the court then is, "Does Plaintiff have a property interest arising from his employment as police chief of the City of Starkville?" The City of Starkville Personnel Policies Manual (Exh. P–17), in spite of its front page disclaimer, and the language contained at the top of defendants' "Employee Grievance Procedure" form (Exh. "6" of "Defs.' Opp. Mem. Brf.") together suggest that Plaintiff at least stands a substantial likelihood of proving he has a constitutionally protected property interest.

█ The Personnel Policies Manual established a formal, official grievance procedure "to maintain harmony and to assure all employees fair treatment...." (Exh. P–17) The manual incorporates express reference to a city grievance procedure form. The form contains the following specific language:

> It is the intent of the City of Starkville ... to extend to each aggrieved employee the right to a *due process* hearing *prior to the taking of any disciplinary action which would in any way deprive an employee of an interest in property.*

(emphasis added) A property interest in employment sufficient to invoke procedural due process protections of notice and an opportunity to be heard need not be embodied in a formal contract or a tenure system. *Glenn v. Newman,* 614 F.2d 467, 471 (5th Cir.1980) (citing *Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976)). The court finds that the grievance procedure outlined in the personnel manual and referenced form may be construed as creating a property interest for Plaintiff in his job as chief of police "sufficient to warrant the protection of the Fourteenth Amendment and the rights of due process." *Glenn,* 614 F.2d at 471. There is a very real possibility that the Board action on the evening of April 14th was taken without affording Plaintiff his minimal due process rights. Defendants placed him on administrative leave and, essentially, relieved him of his official responsibilities without affording him either notice or an opportunity to respond. The matter had already been decided. Throughout the day, defendants plotted and designed their strategy in a string of covert, clandestine calls and meetings. It was evident to the board members who were not privy to the day's discussions concerning the newspaper article from the previous day, that the meeting had finished before it had even started. The court is satisfied that Plaintiff has demonstrated a substantial likelihood of prevailing on his claim of a procedural due process claim. In a similar fashion, Plaintiff has shown a

---

6. In his supporting memorandum brief accompanying the request for a preliminary injunction, Petitioner alleges a deprivation of a liberty, rather than property, interest, citing *Board of Regents of State Colleges v. Roth,* 408 U.S. at 573, 92 S.Ct. at 2707, 33 L.Ed.2d at 558. At a trial on the merits, it may appear that he, in fact, possesses both liberty and property interests. The court, however, saves discussion of a liberty interest for a later day, and elects for present purposes to focus exclusively on a property deprivation.

strong probability of succeeding on the substantive due process claim.

### c. *The Substantive Due Process Claim*

The concept of "substantive" due process is "the notion that the Due Process Clause—in addition to setting procedural minima for deprivations of life, liberty, or property—bars outright 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Brennan v. Stewart*, 834 F.2d 1248, 1255 (5th Cir.1988) (quoting *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986)). Substantive due process is violated by state conduct that offends traditional notions of fairness and decency. It is clear to this court that the actions of Defendants throughout April 14, 1993, were an outward manifestation of their flagrant disregard and hostility for Plaintiff's right to free speech under the First Amendment (applicable to the states via the Fourteenth Amendment). "As a matter of doctrinal history the First Amendment, as part of the original Bill of Rights, is incorporated as a substantive right "implicit in the concept of ordered liberty" protected against state intrusion by the Due Process Clause. *Brennan*, 834 F.2d at 1256. *See Brown v. Texas A & M University*, 804 F.2d 327, 336 (5th Cir.1986) (free speech claim by government employee described as a "claim alleging a violation of Substantive Due Process under the First and Fourteenth Amendments").

The underhanded methods employed by defendants to strip Plaintiff of his powers were so contrary to established and accepted procedure for conducting public matters that they carry the shock value inherent in a substantive due process violation. Defendants may have believed that by limiting their aldermanic numbers to less than a quorum, they were cleverly adhering to the letter of the law, namely, the Mississippi Open Meetings Act. 25 MISS.CODE ANN. § 25–41–1 et seq. (1991). These attempts to prove technical compliance are insufficient to justify actions violating the spirit of the law.[7]

Plaintiff no doubt stands a strong chance of prevailing on his substantive due process claim at a full trial. Having addressed the two prongs that generally present the more difficult hurdles in obtaining an injunction, the court briefly speaks to the two remaining *Canal* prongs.

### 3. Balancing of the Equities

The "threatened injury" to Plaintiff, if the injunction is denied, far outweighs the potential harm to Defendants if it ensues. Ironically, benefits will inure to Defendants pursuant to the injunction, since the reinstatement of Plaintiff to his status in office will have the effect of raising and restoring morale in the police force. The corroborating testimony of several witnesses indicated that putting the Chief back to work would be to the department's advantage and thus, the City's as well. The uncertainty over the department's direction and leadership will have dissipated.

### 4. The Issuance of an Injunction Will Not Disserve the Public Interest

The issuance of an injunction reinstating Plaintiff to his full authority as chief of police, the court concludes, is in harmony with the greater public interest of restoring order to the City's law enforcement operations. "[E]nforcing the Constitutional guarantee of freedom of expression" undoubtedly promotes the public interest. *Watts*, 794 F.Supp. at 434. Public confidence in its local electorate body most certainly was eroded as a result of the controversial actions taken by the board in response to Plaintiff's comments to members of the local press corps. The totalitarian measures taken by the board, if permitted to stand, would send a chilling message to the public-at-large that freedom of speech may be undermined without repercussions to offenders of the First Amendment. Most certainly, the public has an overriding, vested interest "in assuring that the constitutional rights of" its fellow citizens, especially those to whom it turns for law enforcement protection, are not muzzled by a fear of retaliation for speaking out on

---

**7.** The statutory language states in part: [I]t is hereby declared to be the policy of the State of Mississippi that the formation and determination of public policy is public business and shall be conducted at open meetings....

**1332**

matters of public concern. *Cohen*, 805 F.Supp. at 408. *Cf. Hayes v. International Organization of Master, Mates & Pilots*, 670 F.Supp. 1330 (D.Md.1987) (reinstatement of union officer removed following his exercise of free speech consistent with public interest of preserving democratic principles). Having met the fourth and final prong of the *Canal Authority* analysis, Plaintiff has exhibited a genuine entitlement to the equitable powers of this court. Accordingly, the request for entry of an order granting him a preliminary injunction is granted. An order in accordance with this memorandum opinion shall be entered.

### ORDER GRANTING PLAINTIFF'S REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF

In accordance with a memorandum opinion entered this day, it is **ORDERED**:

1) The motion of H.B. (Bud) Maxey for a preliminary injunction ordering his full reinstatement as Chief of Police for the City of Starkville is hereby granted;

2) Defendants are directed by order of this court to reinstate Plaintiff to the position he held prior to being placed on administrative leave. The Defendants shall, on Tuesday, June 15, 1993, at 8:00 o'clock a.m., fully restore Plaintiff Maxey to the office of Chief of Police of Starkville, Mississippi;

3) The actions of the Defendants taken on April 14, 1993, placing the Plaintiff H.B. (Bud) Maxey, Jr., on administrative leave, are hereby declared null and void pending the trial of this matter on the merits.