**Robert T. McGREGOR,
Plaintiff–Appellant,**

v.

**LOUISIANA STATE UNIVERSITY BOARD OF SUPERVISORS, et al., Defendants–Appellees.**

**No. 92–3711.**

United States Court of Appeals,
Fifth Circuit.

Sept. 24, 1993.

---

**28.** —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

**29.** —— U.S. at —— and n. 4, 113 S.Ct. at 2749 and n. 4.

Theodor A. Schirmer, Malibu, CA, for plaintiff-appellant.

Nancy C. Dougherty, W. Luther Wilson, Taylor, Porter, Brooks & Phillips, Baton Rouge, LA, defendants-appellees.

Before DAVIS and DeMOSS, Circuit Judges, and ZAGEL [1], District Judge.

ZAGEL, District Judge:

Robert T. McGregor suffered permanently disabling head and spinal injuries from a series of unfortunate accidents that occurred in 1968, 1972, and 1979.[2] His injuries have required and continue to require extensive treatment and a number of surgical procedures. Despite these setbacks, McGregor was determined to pursue a legal career. He took the LSAT in October 1987; his score was a 26. Upon recommendation of Professor Joseph from the Louisiana State University Paul M. Hebert Law Center ("Law Center"), McGregor took the LSAT a second time. He scored a 33. This score, combined with his undergraduate grade point average ("GPA") of 2.6, gave him an index of 93. The index cutoff for admission at the Law Center was 90. The Law Center admitted McGregor as a law student in 1988.

This action began after McGregor repeatedly failed to achieve a passing cumulative GPA and after the Law Center refused to allow McGregor to advance to the junior year. Eventually, the district judge granted the defendants' motions for summary judgment and dismissed the case in its entirety. McGregor filed a timely notice of appeal. This Court has jurisdiction to hear the appeal pursuant to 28 U.S.C. § 1291.

1. District Judge of the Northern District of Illinois, sitting by designation.

2. McGregor's difficulties began after he was involved in a near fatal automobile accident in 1968 and suffered a compression fracture of the lumbar spine at L–1 and L–2. McGregor's condition was later aggravated by a second accident that occurred in 1972 while he was working as a commercial photographer on board a United States vessel. Finally in 1979, "because of [his] hectic pace and the self[-]imposed physical demands, ... [he] suffered a severe fracture of the lumbar spine at L–1, L–2, and L–3, L–4."

3. The Law Center employs an admission and retention practice that has been coined "weeding out." Admission to the Law Center's program is based on a specified number of seats. The goal of the admissions committee, and consequently the purpose of the minimum admission index, is

## I. REHABILITATION ACT

Section 504 of the Rehabilitation Act of 1973 provides that:

[n]o otherwise qualified individual with handicaps ... shall, solely by reason of his or her handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity[, including those operated by a college, university, or other postsecondary institution, or a public system of higher education,] receiving Federal financial assistance.

29 U.S.C. § 794. No one in this case disputes that McGregor is handicapped or that the Law Center receives federal funding. The question here is whether McGregor is an "otherwise qualified individual" who has been denied the benefits of the Law Center's program solely because of his handicap. McGregor suggests that he is otherwise qualified by virtue of admittance into the Law Center's program. McGregor is correct that his undergraduate record and LSAT score render him otherwise qualified for admission. In argument, McGregor often ignores the difference between being otherwise qualified for admission and being otherwise qualified for retention. Many students, handicapped or not, who qualify for admission into law school flunk out. They are not qualified for retention. The question here is whether McGregor is otherwise qualified for retention in the Law Center's program.[3]

to accept enough students so that all available seats are filled. This generally requires that the number of students accepted be higher than the number of seats available. Once admitted, the "weeding out" begins so that the number of freshman students greatly exceeds the number of students that proceed to the junior year. A recent self-study indicated that half of the total attrition is attributable to academic attrition; "the other half dropped out voluntarily, although most of them were not the high performers." The statistics revealed that the academic attrition rate in the freshman year for the 1980's fluctuated from 14.3% to 32%. "The Faculty's position is that, although considerably higher than in comparable law schools, this attrition rate is the direct consequence of the relatively low admission standards in force at the LSU Law Center."

Retention requirements generally take the form of minimum cumulative GPAs in a designated curriculum. Freshman students at the Law Center must attend full-time and achieve an overall average of 68 in the designated freshman course load in order to return for the junior year. A separate set of academic requirements, however, apply in the first freshman semester—a student must achieve at least an overall average of 65 to proceed to the second semester. A student who makes less than a 65 average during the first freshman semester may not attend the second semester and must apply for readmission. Ordinarily, the student is not readmitted for the following fall, but must wait an additional year to return.

■ To be otherwise qualified for retention, McGregor must be capable of satisfying the academic and technical requirements set by the Law Center with the aid of reasonable accommodations. 45 C.F.R. § 84.3(k)(3) (1992); *Brennan v. Stewart*, 834 F.2d 1248, 1262 (5th Cir.1988).[4] Judge Duplantier essentially found that despite the Law Center's reasonable accommodations, McGregor failed to meet the academic standards and was not otherwise qualified. Moreover, the judge determined that the additional accommodations McGregor sought were not reasonable because they required the Law Center to alter substantially its academic standards.

■ We will affirm the district judge's grant of summary judgment if no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). When reviewing the record on summary judgment, we must draw all reasonable inferences in favor of McGregor, the nonmoving party. *Harbor Ins. Co. v. Urban Constr. Co.*, 990 F.2d 195, 199 (5th Cir.1993). To avert summary judg-

ment, the nonmoving party must present specific facts showing a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The parties agree as to what accommodations were and were not made. The heated argument concerns their reasonableness. As we recognized in *Brennan*, whether a handicapped person is otherwise qualified, and consequently whether the accommodations are reasonable, are questions of fact. *Brennan*, 834 F.2d at 1260. So we can affirm the lower court's findings only if reasonable men could not differ from the conclusions that the Law Center provided reasonable accommodations and McGregor was not otherwise qualified. *Id.* To decide this, we must review exactly what the Law Center did with McGregor.

### A. Accommodations Made

Prior to freshman registration in the fall 1988, McGregor asked that the Law Center accommodate his disability by permitting him to be a part-time student. The Law Center said no and told him that it had made an academic decision that a full-time freshman schedule is required. Instead, the Law Center made two accommodations for the upcoming freshman year: a handicapped parking permit and, upon McGregor's request toward the end of the first semester, additional time to complete his Criminal Law Examination.[5]

McGregor's overall GPA for the first semester was 61, below the required 65. McGregor, therefore, was supposed to sit out the second semester, reapply for admission, and wait an additional year to return. Instead, during the spring 1989 semester, the Law Center permitted McGregor to audit Professor Devlin's Constitutional Law I, along with a Legal Writing and Research class.[6] The Law Center also assigned Pro-

---

**4.** Technical requirements are "all nonacademic admissions criteria that are essential to participation in the program in question." 45 C.F.R. pt. 84, App. A, at 380 (1992).

**5.** Professor Cheney C. Joseph, Jr., who also served as Vice–Chancellor at the Law Center from 1981–1989, taught McGregor Criminal Law. According to his affidavit, Professor Joseph kept an open-door policy permitting McGre-

gor, at his leisure, to discuss class materials throughout the semester, "more so than any other student in his course that semester."

**6.** The parties dispute whether it is correct to say that the Law Center "permitted" or "required" McGregor to audit the courses. For purposes of the analysis here, it is only important to note that this was an accommodation. The particular characterization has no real consequence under

fessor Devlin with the specific task of providing McGregor with concentrated and individualized tutorial instruction. Devlin attested that he spent one hour each week working with McGregor outside class, which is considerably more time than he has ever spent with any other student. McGregor received a grade of 70 in Constitutional Law I and passed Legal Writing and Research. However, according to McGregor, these passing grades were at the expense of losing full use of his legs. Toward the end of the spring semester, McGregor's treating physician, Dr. Charles Kennon, authorized a wheelchair, apparently only for endurance purposes. Regardless of the reason, McGregor needed a wheelchair by May 1989.

The Law Center eventually readmitted McGregor as a freshman on scholastic probation for the fall 1989 semester, without waiting an additional year after reapplying to return. In a letter dated June 27, 1989, Professor Howard W. L'Enfant, then also the Chairman of the Admissions Committee, informed McGregor of his readmittance under the following conditions:

1. You shall forfeit all credits and quality credits previously earned and shall begin anew as a first year student in the curriculum in effect for 1989–90.

2. You shall be on scholastic probation, and required to earn an average of 68 or better during each of the next two semesters.

3. You shall carry a full load of work during each of the next two semesters.

4. You will not be permitted to engage in any outside work during the fall semester 1989 and spring semester 1990.

In addition to early readmittance, the Law Center made other adjustments for McGregor during this next semester. Prior to the

1989–90 academic year, the Law Center sent McGregor a proposed schedule of first year classes. It is undisputed that classes were switched so that he would attend them in the new instead of the old building, for easier access with a wheelchair. To accommodate further his wheelchair, the Law Center acquired special handicapped tables for the classrooms and removed the inner door in the first floor bathroom. Throughout the year, many of McGregor's professors assisted him with his academic work outside of class.[7]

In the fall 1989, McGregor was allowed to take three of his examinations at home. In the fourth course (Criminal Law), he was allowed eight hours, instead of the usual four, to complete the examination. When examinations came around in the spring 1990 semester, McGregor requested the same arrangements for at-home examinations. Katherine Spaht, as Vice–Chancellor, responded to McGregor's requests by providing alternative accommodations that the Law Center determined were "reasonable while still maintaining the integrity of the examination process." The Law Center gave McGregor: (1) extra examination time; (2) a choice of taking the exams on the first or third floor; (3) a room equipped with a handicapped table, a special bench from the library, a typewriter and/or dictaphone; (4) a student proctor to take care of his personal needs as well as assisting him with the men's rest room door; (5) permission to eat and drink in the room to maintain his sugar level.

McGregor did not meet the Law Center's probationary requirements. Although McGregor received a 70.2 in the fall semester, he received an average of 65.53 in the spring semester. The acceptable minimum GPA on probation for each semester is a 68.

---

the Rehabilitation Act. However, since the Law Center did not have to let McGregor audit the courses, we believe that the use of the word "permitted" is appropriate and uneventful.

7. For example, Howard W. L'Enfant taught McGregor Basic Civil Procedure in the fall 1989. At that time, he also served as Vice–Chancellor (August 1989 to November 1989) and Chairman of the Admissions Committee (1978 to 1989). He stated in his affidavit that he spent approximately 30–45 minutes per week working with

McGregor on course materials and other matters. He also spent considerable time reviewing and discussing McGregor's answers to a Civil Procedure practice exam. Professor Joseph T. Bockrath, who taught Contracts in the fall 1989, tutored him approximately an hour per week outside of class, working on class materials and practice exam problems. He also counselled McGregor on personal matters in his office at least two times.

McGregor again faced flunking out of law school. And again, McGregor petitioned the Law Center for more accommodations.

In response to the spring 1990 petition, the Law Center agreed to readmit McGregor for the 1990–91 academic year as a first year student subject to two conditions. These conditions were first spelled out in the August 20 letter sent by Katherine Spaht, Vice-Chancellor, to McGregor:

1. permission and encouragement to audit the course in Criminal Law during the fall semester 1990, if, your physical condition permits; and

2. during the second semester, a course load for credit of the four courses in which you made a grade of less than 68 in spring, 1990 (Obligations, Property, Constitutional Law I, Torts II), unless a committee to be appointed by the Chancellor alter[s] the conditions of readmission for the second semester. You will be timely notified of any such change.

McGregor was unsatisfied and sent a letter renewing his demands for advancement to the junior level in addition to a reduced schedule. For the first time, he threatened litigation. The Law Center responded to each of the items listed by McGregor as a "good faith offer to settle this controversy." The Law Center stood by their August 17, 1990 decision that McGregor be readmitted as a freshman. The faculty committee, however, did perhaps the next best thing and reduced his schedule to make room for junior level courses. Under the new modified schedule, McGregor needed to take only Constitutional Law and Obligations in the spring 1991, scheduled so that he had a day between classes for rest or treatment. Torts and Civil Law Property could be taken in the

spring 1992. Moreover, McGregor could take one junior preference course in the summer 1991 and one or two junior preference courses in the fall 1991. If McGregor attained an average of at least 68 in the four first year courses, he could proceed to the junior year; grades in the junior preference courses would not be considered in determining his eligibility to enroll in any semester up to and including the spring 1992 semester. The faculty committee also determined that McGregor could take his examinations at home in the presence of a proctor from the Law Center. After they wrote, McGregor sued them.

### B. Accommodations Required

McGregor attacks the accommodations because they did not directly address his disability, i.e., fatigue and pain that impaired his ability to learn, and argues that the Law Center discriminated against him by insisting on a full-time schedule, in-class examinations, and advancement only upon achievement of a 68 average in each freshman semester. He says this was equal treatment which resulted in unequal opportunity to participate in the law program. The Law Center says that they "bent over backward" to help McGregor; that what McGregor seeks is to blame the Law Center for his mental ineptitude; and that his additional requests for accommodations amount to demands for preferential treatment or a substantial modification of its program, which is not required by law.

The Supreme Court's decision in *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), sets the stage for almost every § 504 handicap discrimination suit involving postsecondary educational programs.[8] There,

---

8. In *Davis*, the plaintiff sought advancement from the Southeastern Community College Parallel Program to Southeastern's Associate Degree Nursing Program, which would make her eligible for state certification as a registered nurse. Davis, however, suffered a serious hearing disability which prevented her from discriminating among sounds sufficiently to understand normal spoken speech, even with the use of a hearing aid. The experts attested that it would be impossible for her to participate safely in the normal clinical training program and that the modifications necessary would prevent her from realizing the benefits of the program. The consensus was that "[t]o adjust patient learning experiences in keeping with [her] hearing limitations could, in fact, be the same as denying her full learning to meet the objectives of [Southeastern's] nursing program." *Davis*, 442 U.S. at 402, 99 S.Ct. at 2365. The Supreme Court determined that Southeastern did not violate § 504 of the Rehabilitation Act when it denied Davis admission to its program based on her inability to meet the physical requirements of the clinical training program.

the Supreme Court emphasized that § 504 proscribes use of the "mere possession of a handicap ... [as] a ground for assuming an inability to function in a particular context." *Id.* at 405, 99 S.Ct. at 2366. Here, the Law Center has not and does not assume that McGregor cannot function in its legal educational environment. Unlike the plaintiff in *Davis*, McGregor gained admission to the law school program. Some accommodations were made to allow McGregor to participate and to remain a participant in the program. Despite the Law Center's joint efforts and McGregor's repeated attempts, McGregor did not achieve the necessary GPA to advance to the junior year. McGregor's repeated attempts demonstrate that he cannot function successfully in the Law Center's program.[9]

McGregor argues that he could succeed in law school if the Law Center accommodated him with (1) a part-time schedule and (2) at-home examinations.[10] As proof of his abilities, he points to the spring 1989 semester (during which he earned a 70 in Constitutional I and passed Legal Writing and Research) and the fall 1989 (during which he received a 70.2 cumulative GPA with three at-home examinations and extra time on the fourth in-class examination). First, we are unpersuaded that this is competent evidence that McGregor can meet the academic demands set by the Law Center on a part-time schedule. McGregor received these passing scores after having a second crack at the courses. Second, his ability to pass given a part-time schedule is not dispositive of the issue here. We agree with the Law Center that many more students could succeed in law school on a part-time schedule. While other law schools in Louisiana and in other states have part-time students, the Law Center has made an academic decision to require that all freshman students carry a full-time course load. Any deviation from this constitutes an accommodation for McGregor's disability. We must decide whether § 504 requires the Law Center to accommodate McGregor either by giving him a part-time freshman schedule or at-home examinations or by advancing him to the junior year despite his failure to satisfy the minimum standard GPA, and later the minimum probationary GPA.

■ The Supreme Court in *Davis* made clear that § 504 does not mandate that an educational institution "lower or [ ] effect substantial modifications of standards to accommodate a handicapped person," assuming such standards are reasonable. *Id.* at 423, 99 S.Ct. at 2377. This rule was crafted in an effort to balance the institution's right to decide the basic requirements pertinent to its program and the handicapped student's right to participate. *Alexander v. Choate*, 469 U.S. 287, 300, 105 S.Ct. 712, 720, 83 L.Ed.2d 661 (1985). The extent of an institution's affirmative duties to accommodate handicapped individuals is far from clear. The best that opinions following *Davis* have been able to state definitively is that an educational institution must make "reasonable," but not "fundamental" or "substantial" modifications to accommodate the handicapped. *E.g., Brennan*, 834 F.2d at 1261. McGregor, therefore, is entitled to the requested accommodations only if he can demonstrate that the accommodations constitute reasonable deviations from the Law Center's usual requirements "which meet[ ] his special needs without sacrificing the integrity of the [Law

---

9. Initially, McGregor maintains that he did function adequately in law school. McGregor continually emphasizes that his overall GPA for both semesters during the 1989–90 academic year was 67.9. McGregor's emphasis is misplaced. First, McGregor was on scholastic probation during that year and was required to have a 68 average in each semester. Second, regardless of whether one includes both semesters in the calculation or not, McGregor's GPA fell short of both the probationary academic requirement and the nonprobationary requirement (i.e., 68 average for both semesters). To allow McGregor to proceed to the junior level without satisfying the minimum GPA is an accommodation for his disability. The question then is whether § 504 mandates such an accommodation.

10. McGregor did not take advantage of the Law Center's final offer for a modified schedule in response to his June 1990 petition. At oral argument, McGregor suggested that the reason was because the Law Center had withdrawn their offer for at-home examinations. This suggests to us that what McGregor seeks is both a part-time schedule with at-home examinations or, alternatively, advancement to the junior year without the requisite GPA.

Center's] program."[11] However, absent evidence of discriminatory intent or disparate impact, we must accord reasonable deference to the Law Center's academic decisions. *Brennan*, 834 F.2d at 1261 (quoting *Doe v. Region 13 Mental Health–Mental Retardation Comm'n*, 704 F.2d 1402 (5th Cir.1983) and *Alexander v. Choate*, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985)).

The record on summary judgment is devoid of evidence of malice, ill-will, or efforts on the part of the Law Center to impede McGregor's progress. Therefore, we must accord deference to the Law Center's decisions not to modify its program if the proposed modifications entail academic decisions. McGregor characterizes the proposed changes as reasonable schedule modifications since the ABA accredits programs with part-time or evening students and the Law Center's bulletin allows such deviation in exceptional circumstances. This does not persuade.

First, whether the ABA accredits part-time programs is not determinative of reasonableness under the Rehabilitation Act,

and we refrain from giving ABA accreditation such adjudicatory effect. Second, the fact that the Law Center has recognized in its Bulletin that exceptional circumstances may prompt the institution to alter its full-time attendance does not mean that such an alteration is not substantial. Given the Law Center's history and admittance practices, the full-time attendance requirement is critical to their program and the requested deviation would be a substantial modification under any circumstance.[12] Whether the Law Center yields to such a request and whether § 504 requires the Law Center to yield to such a request are two different questions.

We conclude that the Law Center's decisions to require full-time attendance and in-class examinations for first year students are academic decisions, ones which we find reasonable in light of the Law Center's admittance practices. The first year courses are specifically chosen to simulate the same challenges found in the practice of law, i.e., to assess and assimilate various legal theories in an intelligible manner. The Law Center has structured an intensive program with

---

**11.** At oral argument, McGregor suggested that once a handicapped individual is admitted as otherwise qualified in the program, the burden shifts to the institution to show why the proposed accommodations effects a substantial modification of its program. We disagree. McGregor cites 34 C.F.R. § 104.44(a) for support. This regulation requires institutions to modify their academic requirements "to ensure that such requirements do not discriminate or have the effect of discriminating, on the basis of handicap, against a qualified handicapped applicant or student." 34 C.F.R. § 104.44(a) (1992). The regulation further provides, "Academic requirements that the recipient can demonstrate are essential to the program of instruction being pursued ... will not be regarded as discriminatory within the meaning of this section." *Id.* The appendix analyzing this regulation makes no mention of any burden of proof imposed on the institution regarding academic adjustments; rather, it "stresse[s] that academic requirements that can be demonstrated by the recipient to be essential to its program of instruction ... need not be changed." 34 C.F.R. pt. 104, App. A, at 434 (1992). This Circuit in *Brennan*, likewise, did not interpret the statute and implementing regulations to impose such a burden of proof on the institution. In *Brennan*, we first determined that the institution's requirements were reasonable. However, we remanded the case and imposed a burden on the plaintiff "to demonstrate to the

court that some reasonable accommodation in these requirements [] meets his special needs without sacrificing the integrity of the Board's licensing program." *Brennan*, 834 F.2d at 1262. Ultimately, to recover under the Rehabilitation Act, McGregor must demonstrate that his requests are reasonable and do not sacrifice the integrity of the Law Center's program. The imposition of this burden on McGregor is not only consistent with precedent but broadens some plaintiffs' chances of prevailing. Simply placing the burden on the Law Center to explain why McGregor's requests effect a substantial modification only diminishes McGregor's chances of prevailing, since arguably all the regulations require is that the institution articulate a legitimate nondiscriminatory reason for not altering the program.

**12.** The Law Center admits a large pool of freshman students and then imposes high academic standards, a practice which inevitably results in a high attrition rate. Because a high attrition rate "carries a heavy burden of persuasion," it is crucial that the Law Center impose academic standards that are not only fair, but that students perceive to be fair. It appears that the Law Center is trying to ameliorate the high attrition rate. The faculty, however, is adamant that it tackle this problem by raising admission standards, not by lowering promotion or graduation standards.

high academic standards, which it believes is best equipped to produce high quality lawyers. Essential to its program is a level playing field for all students: First year students cannot engage in outside work during the semester; they must take the same required courses in the same semesters; the examinations are given in class at the same time for each class section; and the final grades are generally based entirely on the final examinations.

The Law Center's program, though strict, is effective by some accepted measures. The Law Center has had and continues to have the highest bar passage rate in Louisiana. McGregor proposes that the Law Center create for him a law school program, either with a part-time schedule and at-home examinations or with lowered passing GPA requirements. These additional accommodations clearly force the Law Center either to lower its academic standard and pass McGregor to the next level or to compromise the reasonable policy of its academic program and allow McGregor to attend part-time and take his examinations at home. Section 504 does not require this much.[13]

The Law Center proved, by way of L'Enfant's affidavit, that no other student has ever been allowed to audit a course in the second semester after failing the first semester, and that "no other student, under any circumstances, has ever had a professor assigned to him for the specific purpose of concentrated tutorial instruction on a one on one basis." Also, no student other than McGregor has ever been permitted to take examinations at home, except in the junior or senior level courses in which all students took the examinations at home. Furthermore, no student has ever received the additional accommodations requested. Although the Bulletin allows for schedule changes under exceptional circumstances, the Law Center has not, in fact, permitted it and says that even under exceptional circumstances, a student must have proven his analytical abilities to succeed in the law program before receiving such an accommodation.

Viewing the undisputed facts, we can conclude only that the Law Center reasonably accommodated McGregor's disability and that the additional accommodations, if granted, would constitute preferential treatment and go beyond the elimination of disadvantageous treatment mandated by § 504. *Brennan*, 834 F.2d at 1259–60. We agree with Judge Duplantier that despite the reasonable accommodations provided, McGregor did not achieve the minimum cumulative GPA as required under the academic standards set by the Law Center. McGregor, therefore, is not an otherwise qualified individual who has been denied the benefits of the Law Center's program solely because of his handicap. We affirm the summary judgment in favor of the defendants on the Rehabilitation Act claims.

### C. Accessibility Requirements

■ Judge Duplantier recognized that McGregor's demands regarding the bathroom door and entrance ramp at the Law Center "probably describe reasonable accommodations; however, these suggested changes standing alone would certainly not affect plaintiff's ability to meet the Law Center's academic requirements."[14] McGregor

---

**13.** *See* 34 C.F.R. pt. 104, App. A, at 434 (1992) ("This requirement ... does not obligate an institution to waive courses or other academic requirements.").

**14.** McGregor's complaints regarding physical access to the Law Center included, among other things, the fact that there was only one wheelchair accessible lavatory stall on the first floor of the Law Center, which did not have a wheelchair accessible wash basin or mirror. McGregor supported his complaints with architect Louis H. Faxon's preliminary report, prepared after inspecting the Law Center's facilities on March 22, 1991, and Dr. Irving K. Zola's expert report, prepared after reviewing Faxon's video tape of the Law Center. Enumerated in Faxon's prelim-

inary report were fifteen items which he considered to violate federal law, specifically "Act 625 of the 1977 Legislature," including: narrow entrance doors to building, bathroom stall, and first floor student storage area; no south entrance ramp; no complete barrier-free restroom facility; library card catalogs not completely accessible to wheelchair bound person; "tiered" configuration of classroom forces wheelchair bound person to confine his seating to the front corners of classrooms; narrow space between bookstacks; space between floor level and elevator cab obstructs wheelchairs. Dr. Zola, likewise, concluded that "physical access at the Law Center does not conform to any existing state or federal architectural standards vis-a-vis disability."

contends that Judge Duplantier erred by considering the accessibility and physical barrier issues in conjunction with reasonable accommodations. We disagree.

McGregor himself intermingles the two issues. The crux of McGregor's claim here is that the Law Center violated § 504 with respect to physical access to its facility which resulted in his poor academic performance. Also, on appeal, McGregor argues that the fact question is "whether or not the physical barriers and lack of accessibility were sufficient to prevent plaintiff from achieving the academic requirements of the Law Center in a given semester."

More importantly, the fact that the Law Center facility was completed in 1969, prior to June 3, 1977, the effective date of the regulations regarding accessibility standards, changes the focus from the accessibility of the facility to the accessibility of the program. According to the regulations, only facilities where construction commenced after the effective date of the regulations must "be designed and constructed in such a manner that the facility or part of the facility is readily accessible to and useable by handicapped persons." 45 C.F.R. § 84.23(a) (1992) (section entitled "New Construction, Design and Construction"). Because there has been no construction on the Law Center since 1969 (other than for ordinary maintenance and repair), a separate set of regulations applies to the Law Center. The Law Center must:

> operate each program or activity ... so that the **program or activity, when viewed in its entirety, is readily accessible** to handicapped persons. This paragraph does not require a recipient to make each of its existing facilities or every part

of a facility accessible to and usable by handicapped persons.

84 C.F.R. § 84.22(a) (1992) (section entitled "Existing Facilities, Program Accessibility") (emphasis added); *see* 45 C.F.R. § 84.22(a) (almost identical language).[15] So the issue raised is not whether **the Law Center facility is accessible, but whether the program is** accessible.[16] This entails more than a determination that the physical accommodations were reasonable; a court must determine whether McGregor could access the program had the physical changes been made.

Judge Duplantier decided that while the suggested changes were probably reasonable, they "would certainly not affect plaintiff's ability to meet the Law Center's academic requirement." Judge Duplantier, therefore, properly considered the question of accessibility. Furthermore, his conclusion is supported by the undisputed facts.

The record reflects that the Law Center's program was accessible to McGregor and that physical barriers did not prevent him from being otherwise qualified for retention. McGregor was not in a wheelchair during the first freshman semester when he first flunked out. He began to use the wheelchair toward the end of the spring 1989 semester in which he audited courses. The Law Center provided McGregor with a key to an additional elevator which accessed all floors and a ramp at the main entrance. The Law Center also acquired a handicapped table and scheduled McGregor's classes in the new building which was more accessible than the old building. The Law Center removed the inner door on the first floor bathroom. A special bench, chosen by McGregor, was provided to aid McGregor during examinations, as was his own student proctor.[17] In addi-

---

**15.** However, had the Law Center altered its facility in a manner that affects usability, it would have an obligation, "to the maximum extent feasible," to make the altered portion "readily accessible to and usable by handicapped persons." 45 C.F.R. § 84.23(b) (1992) (section entitled "New Construction, Alteration").

**16.** The defendants argue that neither Faxon's nor Zola's report is evidence of noncompliance with federal law because both inspected the Law Center's premises as a "new facility" built after the

regulations were effective. We agree that neither expert inspected the premises under the appropriate standard and, therefore, their reports are not conclusive of program accessibility.

**17.** Although there is some dispute over the timing, both parties acknowledge that the Law Center altered the water fountain and restroom and made special library accommodations and classroom assignments in anticipation of McGregor's return in the spring 1991.

tion, the Law Center made special arrangements for examinations, tutoring, auditing courses, and early readmission. We agree with Judge Duplantier that the suggested additional changes to the Law Center's physical facility would not affect plaintiff's ability to pass muster at the Law Center and, consequently, would not affect his ability to participate in the Law Center's program. The judgment regarding program accessibility is affirmed.

## II. QUALIFIED IMMUNITY

The district court found that defendants are entitled to qualified immunity from claims brought against them in their individual capacities for violation of the Rehabilitation Act.[18] Qualified immunity shields state officials, performing discretionary functions, from civil liability for actions which reasonably could have been thought to be consistent with rights allegedly violated. *Duckett v. City of Cedar Park*, 950 F.2d 272, 279 (5th Cir.1992). Qualified immunity, however, will not protect state officials if a plaintiff can show that they "violated clearly established statutory or constitutional rights of which a reasonable person would have known." *Brown v. Texas A & M Univ.*, 804 F.2d 327, 332 (5th Cir.1986). In order to trigger this exception, McGregor must show that his right to the requested accommodations was clearly established in a particularized, fact-specific sense so that a "reasonable official would understand that what he is doing violates that right." *Hodorowski v. Ray*, 844 F.2d 1210, 1217 (5th Cir.1988).

McGregor initially urges that the "highly learned" defendants did not bother to research the federal statutes and regulations, but instead chose to "play it by ear" as to what accommodations were reasonable. McGregor contends that had the defendants researched the law, they would have discovered that § 504 required them to accommo-

date him in the manner requested. McGregor says that Professor McGough's memorandum (to Vice Chancellor Spaht) reviewed the merit of McGregor's petition to proceed to the junior year and concluded that he "appear[s] to have a legitimate complaint" under the Rehabilitation Act.

This is not so. The memorandum does not support the conclusion that the right to the requested accommodations was clearly established so that a reasonable person would know that denial of his petition violated his statutory and constitutional rights. In fact, it supports the opposite conclusion. In the memorandum, Professor McGough said (quite correctly) that "there is no reported case ... which construes the programmatic adjustments which an educational institution may be called upon to make." Moreover, the memorandum opined (maybe not so correctly), "The reported appellate cases construing the federal Rehabilitation Act are all quite bizarre and clearly distinguishable from Mr. McGregor's case."

The contour of a postsecondary institution's affirmative duty to accommodate a handicapped student is shaped on a case-by-case basis. McGough's memorandum is proof of this. McGregor conceded at oral argument that the Fifth Circuit has not yet adjudicated whether § 504 requires a postsecondary educational institution to accommodate a handicapped individual with either a part-time schedule, at-home examinations, or advancement to the next level without successfully completing the first level courses. We find that McGregor's right to the requested accommodations was not clearly established in a sufficiently particularized manner so that the defendants would have understood that denial of McGregor's petitions violated that right. We affirm the district judge's dismissal of the Rehabilitation Act claims brought against the defendants in their individual capacities.[19]

---

**18.** The administrative policies and resolutions adopted by LSU's Board of Supervisors prompted McGregor to name as individual defendants various professors, chancellors, and members of the Faculty Committee of Admissions. Because their names are of no significance, we will not take the time to list them here.

**19.** We also agree with Judge Duplantier that even if McGregor stated a claim for violation of clearly established rights, qualified immunity shields the defendants from individual liability in this case. Qualified immunity protects a state official, even where his conduct violates a clearly established right, if his conduct was objectively reasonable. *Duckett*, 950 F.2d at 280. The un-

## III. FOURTEENTH AMENDMENT DUE PROCESS CLAIMS

McGregor amended his complaint to add due process claims.[20] These claims are that the Law Center deprived McGregor of due process on three petitions submitted to the Law Center: (1) his June 5, 1989 petition to be re-admitted to the law school on a part-time basis; (2) his spring 1990 petition to attend law school on a part-time basis; and (3) his spring 1990 petition to advance to the junior level. McGregor alleges that the Law Center denied him due process by not providing a written procedure or policy for notifying him of his right to appeal the denial of his petitions.

■ Louisiana's one-year limitations period for "offense and quasi-offenses" applies here. *Jones v. Orleans Parish School Board,* 688 F.2d 342, 344 (5th Cir.1982), *cert. denied,* 461 U.S. 951, 103 S.Ct. 2420, 77 L.Ed.2d 1310 (1983). The limitations period for federal claims begins to run when a plaintiff "knows or has reason to know" of the injury,[21] or in this case, when McGregor received notice of the alleged discriminatory decision that is also the basis of his due process claims. *St. Amant v. Benoit,* 806 F.2d 1294 (5th Cir.1987) (§ 1983 claim accrued on date plaintiff received letter indicating that his transfer request was denied); *Morse v. University of Vermont,* 973 F.2d 122, 125 (2d Cir.1992) ("timeliness of a [§ 504] discrimination claim is measured from the date the claimant receives notice of

the allegedly discriminatory decision"). McGregor filed his due process claims more than a year after he received notice of the Law Center's denial of his spring 1990 petitions. These claims are too late. McGregor, however, invokes various "saving" doctrines to keep his claims alive. We treat them in turn.

### A. Relation-Back Doctrine

■ McGregor argues that his due process claims are not time-barred because the second amended complaint relates back to the original pleading. To relate back, McGregor's due process claims must have arisen out of the "conduct, transaction, or occurrence set forth" in the original complaint. FED.R.CIV.P. 15(c)(2).[22] The second amended complaint will not relate back if it asserts new or distinct conduct, transactions, or occurrences as the basis for relief. *Holmes v. Greyhound Lines, Inc.,* 757 F.2d 1563, 1566 (5th Cir.1985).

McGregor highlights three references in the original complaint to unsuccessful part-time scheduling requests to demonstrate that the second amended complaint arises from the same nucleus of operative facts alleged in the original complaint.[23] McGregor first points to paragraph 10, which reads: "The scheduling requests were totally rejected by the Center's administration; Mr. McGregor was forced to comply with the Law Center's full-time, 'mandatory' freshman schedule,

---

disputed facts on summary judgment can lead only to the conclusion that defendants acted in objective reasonableness in trying to modify their program to meet McGregor's special needs.

20. In the original complaint filed on November 16, 1990, McGregor asserted only a claim of unlawful discrimination under § 504 of the Rehabilitation Act of 1973. McGregor amended his complaint twice. The first amended complaint, filed on October 31, 1991, added as defendants several professors and members of the 1988–1990 Faculty Committee on Admissions for the Law Center. On that same date, McGregor filed a second amended complaint adding Professor Howard L'Enfant, as a defendant, and a cause of action for violation of the Fourteenth Amendment Due Process Clause.

21. *Burrell v. Newsome,* 883 F.2d 416, 418 (5th Cir.1989) (§ 1983 action).

22. Rule 15(c) also provides that an amendment relates back when "permitted by the law that provides the statute of limitation applicable to the action." FED.R.CIV.P. 15(c)(1). In this case, the applicable Louisiana statute reads the same as Rule 15(c)(2). *See* LA.CODE CIV.PROC.ANN. art. 1153 (West Supp.1993).

23. McGregor also initially poses that the Second Amended Complaint relates back to the First Amended Complaint. McGregor's arguments, however, are directed only to the contents of the original complaint. Moreover, relation back to the First Amended Complaint does not further McGregor's cause. The limitations period on the due process claims (absent any estoppel or tolling doctrine) had already expired by the time the First Amended Complaint was filed. Thus, we will confine our discussion to relation back to the original complaint.

with no allowance whatsoever for his handicap." McGregor contends that this sentence, "albeit somewhat obliquely," intimates that he was not afforded due process regarding his initial requests in 1988. McGregor next offers paragraph 22, discussing his June 5, 1989 petition to be readmitted on a part-time schedule. Finally, McGregor quotes the last sentence of paragraph 28, addressing Professor McGough's May 21, 1990 memorandum attached as an exhibit: "The memorandum was written in reference to a petition from plaintiff McGregor requesting permission to continue into the second year of the law school with a 67.9 average."

McGregor's allusions to paragraphs 10 and 22 are fruitless. They concern petitions on which the time for filing a lawsuit had already run on the date of the filing of the original complaint. The June 5, 1989 petition was barred from attack at the time McGregor filed the original complaint, more than a year later, as was any petition filed in 1988. We, therefore, are left with only the reference in paragraph 28 to McGough's memo responding to McGregor's 1990 petition to advance to the junior year.

The original complaint does contain references to McGregor's requests for scheduling accommodations and advancement, and we can infer from the fact that litigation ensued that these requests were denied. This, however, is not the test for relation back. The test is whether the original complaint apprised the Law Center of the due process claims set forth in the second amended complaint. *Holmes,* 757 F.2d at 1566.

We agree with the district judge that the original complaint could not have put the Law Center on notice of the due process claims. The original complaint may suggest

that McGregor was not satisfied with the Law Center's decisions, but it does not plead, even when liberally construed, that the Law Center's decision-making process was inadequate under the Fourteenth Amendment Due Process Clause. No mention is ever made in the prior pleadings of any appeals policy or procedure, and a Due Process claim requires more than a showing that the Law Center refused to accommodate McGregor as requested. McGregor's amendment attempted to add a new legal theory unsupported by factual claims raised in the original complaint. As we see it, the due process claims, seeking relief for the Law Center's inadequate appeal process, set forth new and distinct conduct, transactions, or occurrences not found in the original complaint. Liberal application cannot cure the failure of McGregor's second amended complaint to satisfy the mandate of Rule 15(c). *Holmes,* 757 F.2d at 1566.

## B. Equitable Doctrines

Do tolling or equitable doctrines prevent the running of the prescription so that the second amended complaint was timely filed? Article 3467 of Louisiana's Civil Code provides that "[p]rescription runs against all persons, unless exception is established by legislation." LA.CIV.CODE ANN. art. 3467 (West Supp.1993). The comments to this article clearly indicate that the general tolling and estoppel exceptions still apply.[24] McGregor beckons to his aid the full gamut of legal and equitable doctrines: *contra non valentem,* equitable estoppel, equitable tolling[25], continuing tort, and continuing violations.

### 1. *Contra Non Valentem*

 Attempting to trigger the doctrine of *contra non valentem,* McGregor ar-

---

**24.** *See Plaquemines Parish Comm'n Council v. Delta Dev. Co., Inc.,* 502 So.2d 1034 (La.1987) (discussing *contra non valentem* doctrine's survival after Louisiana's revision of its 1870 Civil Code). This article replaced article 3521, which provided that "[p]rescription runs against all persons, unless they are included in some exception established by law." LA.CIV.CODE ANN. art. 3521 (West 1953) (emphasis added). The official revision comment of the new article 3467 states: "(a) This provision reproduces the substance of Article 3521 of the Louisiana Civil Code of 1870. It does not change the law."

**25.** With respect to equitable tolling, McGregor does nothing more than mention the existence of this doctrine. This Court, in like fashion, summarily finds this doctrine inapplicable. *See Morse v. University of Vermont,* 973 F.2d 122, 125 (2d Cir.1992) (fact that student continues to take courses during internal administrative review of alleged discriminatory decision "has no effect on when the statute of limitations period begins to run").

gues that the Law Center's continued efforts to make some accommodations led him to believe that additional accommodations were forthcoming so that filing suit was not necessary. One of the circumstances in which this doctrine bars prescription is where the plaintiff does not know or is not reasonably capable of knowing that he has a cause of action. *Corsey v. State Dep't of Corrections,* 375 So.2d 1319, 1322 (La.1979).[26] In order to seek refuge in this doctrine, a plaintiff need not allege that the defendant induced his ignorance. *Id.* However, "[t]his principle will not except the plaintiff's claim from the running of prescription if his ignorance is attributable to his own willfulness or neglect; that is, a plaintiff will be deemed to know what he could by reasonable diligence have learned." *Id.*

■ McGregor, through reasonable diligence, could have learned about his right to appeal the denial of his Spring 1990 petition in August 1990, after the Law Center (in a letter dated August 17, 1990) informed him of the outcome of his petition. All McGregor had to do was ask the Law Center a simple question, "If this is your final answer, where do I go from here?" *Contra non valentem* only prevents the prescription from running until the cause of action is known or knowable. The only reason McGregor proffers for not knowing his due process claims is that the Law Center lulled him into a false sense of security that more accommodations were forthcoming. The focus under this doctrine is not what the defendants did but what the plaintiff could have done. McGregor cannot seek a reprieve under the *contra non valentem* doctrine when his failure to file timely the due process claims was the result of his own negligence.

### 2. Equitable Estoppel

McGregor makes the same argument for purposes of equitable estoppel, except that he couches the Law Center's continued efforts to make some accommodations as false representations or deceptive conduct intended to induce him not to file suit. McGregor maintains that this equitable estoppel theory is "identical in effect and application" to the *contra non valentem* doctrine. He offers no further argument on this point other than to cite *Begay v. Hodel,* 730 F.Supp. 1001 (D.Ariz.1990).

In *Begay,* summary judgment was precluded by a genuine issue of material fact as to whether the school officials were equitably estopped from asserting the statute of limitations defense. The Law Center's conduct here, however, cannot be equated to the school district's conduct in *Begay.* In *Begay,* the school officials repeatedly assured the plaintiff that the school would be made accessible in time for the next school year—evidence that the plaintiff had reasonably relied on the school officials' annual assurances that created a factual dispute for trial. The record here reveals no such beguiling promises, much less reasonable reliance. To the contrary, the "promise" the Law Center made, when it repeatedly denied McGregor's petitions, was that it would not grant the accommodations requested.

■ The plaintiff bears the burden of presenting facts "which, if true, would require a court as a matter of law to estop the defendant from asserting the statute of limitations." *Begay,* 730 F.Supp. at 1011 (quoting *Burke v. Gateway Clipper, Inc.,* 441 F.2d 946, 948–49 (3d Cir.1971)). The doctrine of equitable estoppel is deeply rooted in the equitable principle that no one should be permitted to profit from his own wrongdoing in a court of justice. *Id.* (quoting *Bomba v. W.L. Belvidere, Inc.,* 579 F.2d 1067, 1070 (7th Cir.1978)). The rule does not hinge on intentional misconduct on the defendant's part.

---

**26.** The *Corsey* court outlined the following four situations in which the *contra non valentem* is recognized:

(1) Where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action; (2) Where there was some condition coupled with the contract or connected with the proceedings which prevented the creditor from suing or acting; [ ] (3) Where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action ... [; and (4) ] Where the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant.

*Corsey,* 375 So.2d at 1321–22.

Rather, the issue is whether the defendant's conduct, innocent or not, reasonably induced the plaintiff not to file suit within the limitations period. *Id.* McGregor cannot convince any proper trier of fact that he reasonably relied on the Law Center's repeated denials of his requests for part-time scheduling and advancement in forebearing suit for violation of his due process rights. McGregor chose to renew periodically his requests for the same accommodations. Those same accommodations were repeatedly denied, but other accommodations were offered in return. The Law Center is not seeking to profit from any wrongdoing; McGregor is seeking to profit from his failure to act diligently and learn of his right to appeal the denial of his petitions. There is no equitable estoppel in this case.

### 3. Continuing Tort and Violations

■ "The continuing violation theory provides that where the last act alleged is part of an ongoing pattern of discrimination and occurs within the filing period, allegations concerning earlier acts are not time-barred."

*Curry v. United States Postal Serv.,* 583 F.Supp. 334, 342 (S.D.Ohio 1984); *Hendrix v. Yazoo City,* 911 F.2d 1102, 1103 (5th Cir. 1990). McGregor argues that the amended claims were timely filed because the Law Center's failure to provide written policies or procedures for informing students of their right to appeal decisions to the faculty or faculty committee is a continuing violation of the Fourteenth Amendment's Due Process Clause. The Law Center responds that each decision regarding McGregor's proposed accommodations was a different, permanent decision that cannot form the basis for a continuing violation.[27]

■ McGregor cannot use the continuing violation theory to save his due process claims based on the denial of an appeal of his 1989 and 1990 petitions. The continuing violation theory only preserves claims based on acts outside the prescriptive period if the plaintiff timely files a claim based on a present violation. *Id.* at 343; *Hendrix,* 911 F.2d at 1103.[28] The last act which was part of the

**27.** No court to date has accepted this theory in the context of plaintiff's due process claims. In fact, courts, including this one, are wary to use the continuing violation doctrine to save claims outside the area of Title VII discrimination cases. *See, e.g., Calhoun v. Federal Nat'l Mortgage Assoc.,* 823 F.2d 451, 456 (11th Cir.1987) (claim under ADEA and failure to provide hearing did not constitute a continuing violation where there was one decision to terminate employment and defendant never wavered from this position); *Pike v. City of Mission,* 731 F.2d 655, 660 (10th Cir.1984) (defendants' continued denial of reinstatement and due process hearing is a "natural result" of original employment decision and does not comprise a continuing violation); *Perez v. Laredo Junior College,* 706 F.2d 731 (5th Cir. 1983) (assuming, without deciding, that continuing violation theory applies to §§ 1981 and 1983, but only where act is part of "standard operating procedure"), *cert. denied,* 464 U.S. 1042, 104 S.Ct. 708, 79 L.Ed.2d 172 (1984); *Downey v. Southern Natural Gas Co.,* 649 F.2d 302 (5th Cir.1981) (ADEA claims relating to 1974 demotion and 1977 failure to transfer did not amount to "continuing discrimination"); *Detro v. Roemer,* 739 F.Supp. 303, 305 (E.D.La.1990) (each constitutional deprivation, forming the basis of the § 1983 claims, was a separate wrong and did not comprise a continuing violation), *cert. denied,* ── U.S. ──, 112 S.Ct. 305, 116 L.Ed.2d 248 (1991); *but see Jackson v. Galan,* 868 F.2d 165, 168 (5th Cir.1989) (sheriff's repeated garnishment of wages created a continuing violation of due process rights under § 1983 so that plain-

tiff could recover damages for garnishments more than one year prior to the filing of the suit). Even the case cited by McGregor, does not support extension of this doctrine in this case. *Curry v. United States Postal Serv.,* 583 F.Supp. 334 (S.D.Ohio 1984). The plaintiff in *Curry* had filed a Title VII suit alleging employment discrimination on the basis of race and physical handicap. The court explicitly declared as a prerequisite that "[p]laintiff [ ] allege a continuing policy which is a clear violation of Title VII or the Rehabilitation Act." *Id.* at 342.

**28.** In *Hendrix,* this Court discussed the two types of continuing violation cases. In the first type, recovery can be had for the original violation that occurred outside the statute of limitations as long as it is related to other violations that are not time-barred. As we already determined, the due process violations arise from separate conduct, transaction or occurrence than the Rehabilitation Act claims—they are not sufficiently "related" to the § 504 claims timely filed for purpose of the continuing violation theory. In the second type, there are repeated violations, each of which begin the limitations period anew and recovery can be had at least for violations that occurred within the limitations period. *Hendrix,* 911 F.2d at 1103. The last act triggering a new limitations period occurred in Spring 1990. McGregor had a year from then to file his due process claims. It was not until a year and a half later that he asserted the claims in the Second Amended Complaint. He waited too long.

alleged ongoing pattern of denial of due process occurred in spring 1990. McGregor did not assert his due process claims until October 31, 1991, after the prescriptive period expired. Consequently, the spring 1990 act cannot serve as a net for claims based on prior acts clearly outside the prescriptive period.

 McGregor argues that the Law Center's present failure to inform other students of their appeal rights qualifies as an act within the filing period sufficient to trigger the continuing violation theory. In *Berry v. Board of Supervisors of L.S.U.*, 715 F.2d 971 (5th Cir.1983), we recognized, without resolving the issue, that "courts have differed over whether the existence of [a] policy itself constitutes a continuing violation, making a suit timely if the policy remains in effect during the actionable period, or whether there must be some actual application of it to the plaintiff within the period." *Id.* at 979 (case remanded to determine whether "work load discrimination" constitutes a continuing violation extending into 180–day period). One thing is clear. A plaintiff cannot use the continuing violation theory "to resurrect claims about discrimination[, or in this case due process,] concluded in the past, even though its effects persist." *Id.* (quoting *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980)). And, what McGregor wants is just that—to use the continuing violation theory to resurrect claims arising from the Law Center's denial of due process concluded in the past. This is inconsistent not only with our decision in *Berry*, but with the reason for allowing a continuing violation to toll a statute of limitations. The Supreme Court in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), explained that a continuing violation tolls a statute of limitations because statutes of limitations are meant only to prevent stale claims. *Id.* at 380, 102 S.Ct. at 1125. "Where the challenged violation is a continuing one, the staleness concern disappears." *Id.*

Here, the staleness concern is legitimate. McGregor waited almost a year and a half after his spring 1990 petition was denied to assert his due process claims. We must be careful not to confuse continuous violations with a single violation followed by continuing consequences; only continuous unlawful acts can form the basis of a continuous violation. *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977). Furthermore, "the emphasis should not be placed on mere continuity . . . [but on] whether any present violation existed". *Id.* The last due process violation allegedly occurred in spring 1990; only the effects linger on today. The continuing violation theory, therefore, does not save McGregor's due process claims.[29]

## IV. CIVIL RIGHTS CLAIMS

 Judge Duplantier finally granted summary judgment in favor of the defendants on the claims brought under 42 U.S.C. § 1983, 1985, and 1988. McGregor argues that summary judgment was not proper because a genuine issue of material fact exists as to whether the defendants, acting under the color of state law, violated his statutory and constitutional rights. These civil rights statutes do not create substantive rights, but provide a right of action for violation of his statutory and constitutional rights. *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 618, 99 S.Ct. 1905, 1916, 60 L.Ed.2d 508 (1979). In this case, the defendants are alleged to have violated his rights under the Rehabilitation Act and the Fourteenth Amendment Due Process Clause. We have already affirmed the district judge's grant of summary judgment on the Rehabilitation Act claims and due process claims, so that these rights cannot form the basis of his §§ 1983, 1985, or 1988 claims. McGregor does not allege that defendants violated any other statutory and constitutional rights. We, therefore, affirm the grant of summary judgment in favor of defendants on these claims.

29. To the extent that McGregor attempts to ride on the coat tails of his fellow classmates, he cannot. The question is whether McGregor was denied due process during the limitations period. We do not read *Evans* or its progeny as permitting a plaintiff, who has not timely filed, to avoid the effects of the limitations period because the other students may suffer injury from the same policy. The constitutional claim inures to the person who was denied due process.

The judgment of the district court is AFFIRMED.