June 7, 1995

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT


No. 95-1003 

NANCY D. MURPHY,

Plaintiff, Appellant,

v.

FRANKLIN PIERCE LAW CENTER, ET AL.,

Defendants, Appellees.



ERRATA SHEET

The opinion of this court issued on May 31, 1995 is amended as
follows:

On cover sheet, change "Nancy D. Miller on brief pro se." to 
"Nancy D. Murphy on brief pro se." 

May 31, 1995
[NOT FOR PUBLICATION]

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT


No. 95-1003 

NANCY D. MURPHY,

Plaintiff, Appellant,

v.

FRANKLIN PIERCE LAW CENTER, ET AL.,

Defendants, Appellees.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge] 



Before

Torruella, Chief Judge, 
Selya and Boudin, Circuit Judges. 



Nancy D. Murphy on brief pro se. 
Russell F. Hilliard and Upton, Sanders & Smith on brief for 
appellees.





Per Curiam. This is an appeal from the district 

court's grant of summary judgment in favor of appellee

Franklin Pierce Law Center. The district court determined

that appellant Nancy Murphy's claim of handicap

discrimination in violation of 504 of the Rehabilitation

Act of 1973, 29 U.S.C. 794, failed as a matter of law.

I. BACKGROUND 

Murphy suffers from diplopia, a genetic condition

in which weakness in the muscles of the eye causes double

vision and problems with focusing on printed matter. She has

had two surgeries (one necessitated by an automobile

accident) for this ailment. Murphy manages the diplopia by

limiting the amount of time spent reading and by engaging in

muscular exercises prescribed by Dr. John Sebestyen, her

treating physician. Nonetheless, when Murphy applied to the

Law Center in 1987, she was reading without impairment.

Murphy began experiencing academic difficulties

almost as soon as she entered the Law Center. At the end of

her first year, her G.P.A. was 1.88 -- below the minimum

G.P.A. of 2.0 set by the Law Center. Thus, Murphy came

within the jurisdiction of the Academic Standing Committee

("ASC"). At this time, Murphy indicated that her

difficulties were due to a thyroid condition and poor test-

taking skills; she did not mention the diplopia. For her

second year, the ASC required Murphy to maintain a G.P.A. of

2.0 and not to receive a grade below a C-.

Although Murphy met these requirements during the

fall semester, she again came before the ASC as the result of

receiving a D in Evidence during the spring semester.

Combined with D+ grades in two first-year courses, Murphy now

had more than nine credits below a C-. This was in violation

of the Law Center's general academic regulations. Murphy

submitted an analysis of her situation in which she cited,

for the first time, the diplopia as one of the causes of her

academic problems.

Specifically, Murphy stated that the diplopia

produced double-vision, eyestrain, pain and headaches -- all

of which interfered with reading efficiency. On the advice

of Dr. Sebestyen, Murphy did not read in the morning until

she had been awake for three hours, did not read or study for

more than three hours at a time, and slept when she had

trouble focusing. In this letter, Murphy requested that she

be allowed to take tests at three-day intervals so that her

eyestrain would be reduced. At a meeting later in June,

Murphy further asked the ASC to permit her to take oral

examinations.

Murphy also submitted to the ASC a letter from Dr.

Sebestyen, dated August 11, 1989. Based on a July 12 exam,

Dr. Sebestyen concluded that Murphy's convergence was poor

-3-

and that her eye muscles were weak. He recommended that she

break up her reading and studying into "well-defined segments

of time such as two hours at a time, or three hours at the

most."

As for the fifth semester, the ASC allowed Murphy

to take only nine credits -- the usual minimum at the Law

Center is twelve. The terms of Murphy's probation were that

she obtain a 2.3 G.P.A., have no grades under a C- and not

have more than one course with a C- grade. Again, Murphy did

not appeal these terms. At the end of this semester,

however, Murphy's G.P.A. was 1.89; she had failed one course

and had received a D in another.

Murphy was dismissed from the Law Center by letter

dated February 12, 1990. The ASC stated that its decision

was based on (1) Murphy's failure to meet the terms of her

probation, and (2) her entire academic record which

demonstrated that she lacked the ability to complete the Law

Center's degree program. Murphy then pursued an appeal of

the decision of the ASC. The faculty upheld the dismissal

essentially finding that although the ASC had made mistakes,

they did not affect the question of Murphy's ability to

satisfy the academic requirements of the JD program. Murphy

then filed this action in the federal district court.

In granting the motion for summary judgment, the

district court concluded that Murphy had not presented any

-4-

evidence contradicting the Law Center's position that she was

dismissed because she lacked the analytic skills necessary to

succeed in law school. Thus, the district court concluded,

she had not been dismissed "solely by reason of her

disability." The court next held that the Law Center was

entitled to summary judgment on the ground that Murphy was

not otherwise qualified to complete the JD program.

Specifically, the court found that Murphy had failed despite

the fact that she had received all of the accommodations

recommended by Dr. Sebestyen. This appeal ensued.

II. THE LAW 

A. Summary Judgment. 

Our review of an order granting summary judgment is

plenary. Wynne v. Tufts Univ. School of Medicine, 976 F.2d 

791, 794 (1st Cir. 1992) ("Wynne II"), cert. denied, 113 

S.Ct. 1845 (1993). Thus, "we must view the entire record in

the light most hospitable to the party opposing summary

judgment, indulging all reasonable inferences in that party's

favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 

1990). If the record along with affidavits "show that there

is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law,"

we will uphold the grant of summary judgment. Fed. R. Civ.

P. 56(c); Wynne II, 976 F.2d at 794. 

B. The Rehabilitation Act. 

-5-

Section 504 provides that "[n]o otherwise qualified

individual with a disability . . . shall, solely by reason of

her or his disability, be excluded from the participation in,

be denied the benefits of, or be subjected to discrimination

under any program or activity receiving Federal financial

assistance . . . ." 29 U.S.C. 794. We have held that a 

504 claimant must show that he or she (1) was dismissed from

a program which receives federal funds, (2) was disabled, (3)

but nonetheless was otherwise qualified, and (4) was

dismissed solely because of his or her disability. Cook v. 

Rhode Island Dept. of Mental Health, Retardation, & 

Hospitals, 10 F.3d 17, 22 (1st Cir. 1993). The parties do 

not dispute that Murphy is disabled and that the Law Center

receives federal funds. The primary question is whether (1)

Murphy is an "otherwise qualified individual" (2) who was

dismissed from the Law Center solely because of her handicap.

The district court found Murphy's claim wanting on

both issues. Because we find that the district court

correctly determined that Murphy is not an "otherwise

qualified individual," we need not reach the second basis for

the ruling below.

To be otherwise qualified for retention, Murphy

must demonstrate that she was capable of satisfying the

academic and technical requirements set by the Law Center

with the help of reasonable accommodations. See McGregor v. 

-6-

Louisiana State Univ. Bd. of Supervisors, 3 F.3d 850, 855 

(5th Cir. 1993), cert. denied, 114 S.Ct. 1103 (1994). Thus, 

we look to see whether the Law Center either provided

reasonable accommodation for Murphy's diplopia or reached a

rational conclusion that accommodating Murphy would unduly

interfere with its academic program. See Wynne II, 976 F.2d 

at 793. Where, as here, the facts regarding what

accommodations were made are not in dispute, this question is

a legal one. Wynne v. Tufts Univ. School of Medicine, 932 

F.2d 19, 26 (1st Cir. 1991) (en banc) (citation omitted).

III. DISCUSSION 

Murphy argues that the Law Center did not engage in

the required analysis concerning what reasonable alternatives

were available to it for the purpose of accommodating her

diplopia. She points to the faculty's decision affirming her

dismissal in which the involved faculty members note that the

ASC never considered Murphy to be handicapped, never

investigated the information contained in Murphy's letter of

June 9, 1989, never consulted Dr. Sebestyen regarding the

extent of the diplopia despite his letter of August 11, 1989,

and never considered the effects of the diplopia in setting

the probationary terms for Murphy's fifth semester. Murphy

also claims that the Law Center, in fact, failed to provide

any of the accommodations requested by her or recommended by

Dr. Sebestyen.

-7-

The record reveals that the following adjustments

were made for Murphy's fifth semester -- the only time period

to which 504's standards apply.1 First, the ASC permitted

Murphy to carry a reduced credit load. Of the four courses

Murphy took, one was a "mini-course" in which the final

examination was scheduled prior to the regular exam period.

The grade in another course was based solely on written work.

This left two courses in which Murphy was required to sit for

standard examinations. Finally, Murphy requested, and

received, an extra hour in which to complete her

examinations.

We find that these measures satisfied the Law

Center's obligation to provide reasonable accommodations to

Murphy. Besides resting and being awake for three hours

before reading, the only recommendation made by Dr. Sebestyen

relevant to test-taking was that Murphy read in blocks of

time no greater than two to three hours and that her tests be

scheduled at three-day intervals. We note initially that

there is no evidence that Murphy's fifth semester

examinations were arranged in a manner contrary to Murphy's

 

1. Because Murphy never informed the Law Center that the
diplopia was interfering with her ability to perform until
after the end of her fourth semester, it is not chargeable
with notice of this handicap before then. See Wynne II, 976 
F.2d at 795 (to be liable under 504, an academic
institution must have, or reasonably be expected to have,
knowledge of a student's disability) (citation omitted).

-8-

proposed schedule. Thus, it appears that she had sufficient

time between her examinations to permit her to rest her eyes.

As for the extra hour for the completion of her

examinations, Murphy complains that the only effect of this

accommodation was to lengthen the three- to four-hour

duration of finals to four to five hours. Thus, she

concludes, she was forced to exceed the limits placed on her

by Dr. Sebestyen. However, Dr. Sebestyen never indicated

that Murphy required more than the usual time for completing 

her tests. Thus, instead of using the extra hour to complete

the examinations, we perceive no reason why Murphy could not

have taken the additional hour to rest her eyes or to sleep,

thereby following Dr. Sebestyen's specific advice.

Murphy also emphasizes that she never was given

oral examinations as she had asked. According to Murphy, in

response to this request and in an apparent effort to

understand the effects of Murphy's diplopia, the ASC arranged

for a second Evidence examination to be administered orally.

Due to a mix-up, however, the test was in written form when

Murphy took it. When the ASC set the terms for the fifth

semester, it nonetheless was under the mistaken impression

that the exam had, in fact, been oral.

We do not find the want of oral examinations

probative of a failure reasonably to accommodate Murphy's

diplopia. Simply, there is no evidence that Murphy had

-9-

difficulty reading for two or three hour time periods or that

her comprehension was reduced by having to read, as opposed

to hearing, her examinations. Dr. Sebestyen never

recommended oral examinations or suggested that Murphy

refrain from reading altogether. In short, Murphy has not 

shown that her performance would have improved through oral

exams; that is, she has not shown that she would be otherwise

qualified if tested orally.

Murphy further argues that by requiring her to

maintain a 2.3 grade point average in the fifth semester, the

ASC had demanded more of her than of non-probationary

students (who needed to maintain only a 2.0 average). In

this regard, Murphy points out that her overall average at

the end of the fifth semester was 2.05 -- above the Law

Center's minimum requirement. The faculty noted in its

decision upholding Murphy's dismissal that students on

probation were often required to have grade point averages

higher than the minimum.

Murphy did not submit any evidence showing that she

was singled out or that the ASC demanded the higher G.P.A.

for discriminatory reasons. Merely requiring special

probationary terms is not sufficient to demonstrate that the

Law Center failed adequately to accommodate Murphy. See 

McGregor, 3 F.3d at 858 n.9, 860 (where disabled law 

student's G.P.A. was above the minimum imposed on non-

-10-

probationary students, but below the G.P.A. set forth in the

terms of his probation, 504 did not require the law school

to let him proceed to his next year). In any event, Murphy

still failed to comply with the generally applied academic

provision that a student have not more than nine credits

below a C-.

Murphy's most emphatic argument is that the

district court erred in assigning the burdens of production

and persuasion that the parties must meet in a Rehabilitation

Act claim. She correctly notes that the circuits are divided

on this question. One camp holds that the plaintiff must

make a prima facie showing that she would be qualified to

participate in the program if reasonable accommodations were

made. The burden then shifts to the defendant to produce 

evidence that reasonable accommodations were made and/or that

the plaintiff's requested accommodations would unduly

interfere with the quality or integrity of the program. At

that point, the burden shifts back to the plaintiff to rebut

that evidence or show that the institution's actions were a

pretext for discrimination. See, e.g., Teahan v. Metro-North 

Commuter R. Co., 951 F.2d 511, 515-16 (2d Cir. 1991). 

Another camp places on the defense the burden of persuasion, 

rather than production. See, e.g., Pushkin v. University of 

Colorado, 658 F.2d 1372, 1387 (10th Cir. 1981). This circuit 

has never squarely addressed the issue.

-11-

Murphy argues that the district court wrongly

applied the production standard rather than the persuasion

standard. But under any standard she must, at the very

least, make a sufficient prima facie case that she would be

qualified with the aid of oral examinations, the only

requested accommodation that the school did not provide. As

we noted earlier, she did not make that showing. Murphy's

tests were administered at intervals of several days, and

they did not require her to read for more than three hours

without a break. There is no reason to think that Murphy's

performance would improve if she were not required to take

written examinations at all.

IV. CONCLUSION 

The fact that the ASC might not have specifically

considered the effects of Murphy's diplopia in determining

what accommodations to provide does not mean that the

accommodations she actually received were not "reasonable"

within the meaning of 504. We therefore conclude that, as

a matter of law, Murphy was not otherwise qualified for

retention as a student at the Law Center. That is, even with

the accommodations provided by the ASC, she was unable to

meet both the Law Center's degree requirements and the terms

of her probation.

The judgment of the district court is affirmed. 

-12-